Louis Both, et al., as Legatees Under the Last Will and Testament of Sophia Both, Deceased, Dated May 3, 1952, and John Both, as Executor Thereof, Appellees; v. Frank Emery Nelson, Appellant.

Gen. No. 49,155.

First District, First Division.

January 6, 1964.

McFarland, Morgan & Stearns, and Leonard W. Stearns, all of Chicago, for appellant.

William Parker Ward and Edwin Walsh, both of Chicago, for appellees.

MR. JUSTICE MURPHY delivered the opinion of the court.

This is a will contest. Sophia Both, the decedent, 78 years old, executed the purported will on October 16, 1957. Plaintiffs sue as legatees under a prior will, dated May 3, 1952. The issues were lack of testamentary capacity and undue influence by defendant, the sole beneficiary. Defendant appeals from a verdict and decree which found that the instrument offered in evidence was not the last will and testament of the decedent.

The testatrix died July 21, 1959, leaving collaterals as her heirs at law. She had been married to William Both, and they executed separate wills on May 3, 1952. The instant will was executed five years later, during the last illness of her husband, who died October 31, 1957. The sole beneficiary, defendant Frank Emery Nelson, was the husband of a deceased niece of Sophia.

Defendant contends that plaintiffs fail completely to establish a prima facie case on either issue and, therefore, the trial court erroneously denied his motion for a directed verdict at the end of plaintiffs' case. It is further contended that the trial court erred in the admission and exclusion of testimony and in the giving of instructions to the jury.

█ We believe the principal determinative question is whether plaintiffs adduced any evidence fairly tending to prove either lack of testamentary capacity or undue influence. In order to affirm, absent prejudicial trial errors, we need only to find a prima facie case as to either of the two issues. A reviewing court will not consider questions or contentions which are not essential to the determination or final disposition of the cause before it, or questions of which decisions will serve no beneficial purpose to the litigants. ILP, Appeal and Error § 631.

71

■ The principles to be applied here were considered by this court in Malone v. Malone, 26 Ill App2d 291, 167 NE2d 703 (1960). A motion for directed verdict in a will contest is governed by the same rules which govern such motions in actions at law. The contestants are entitled to the benefit of all the evidence considered in its aspects most favorable to them, together with all reasonable inferences to be drawn therefrom, and the only question on review is whether there is any evidence tending to prove the allegations in the complaint. If no evidence is introduced tending to prove the allegations of the complaint, or if but a bare scintilla of evidence has been adduced, the court should grant a motion for a directed verdict. Peters v. Catt, 15 Ill2d 255, 260, 154 NE2d 280 (1958); Quellmalz v. First Nat. Bank of Belleville, 16 Ill2d 546, 158 NE2d 591 (1959).

■ ■ The testamentary capacity required of a testator is sufficient mental ability to know and remember who are the natural objects of his bounty, to comprehend the kind and character of his property, and to make disposition of that property according to some plan formed in his mind. Eccentricity does not constitute unsoundness of mind. Neither old age, peculiarities, feebleness, nor miserly habits, of themselves, show a lack of testamentary capacity. (Quellmalz v. First Nat. Bank of Belleville, 16 Ill2d 546, 553, 554, 158 NE2d 591.) It has been repeatedly held that one who is capable of transacting ordinary business affairs is capable of making a valid will. Quathamer v. Schoon, 370 Ill 606, 611, 19 NE2d 750 (1939); Sterling v. Dubin, 6 Ill2d 64, 74, 126 NE2d 718 (1955).

■ On the issue of lack of testamentary capacity, plaintiffs introduced three witnesses. The first witness was an interne at the hospital to which the testatrix was taken four days after the execution of the will.

72

Without independent recollection, he testified from a hospital record made by him on October 21, 1957, that she was 78 years of age, deaf, senile and dysarthric, which means disturbance of speech. She was suffering from a cerebral vascular accident—a small stroke, which sometimes causes pain. On cross-examination, the interne stated that it was probable that he received the case history from the patient herself—she was suffering primarily from a cerebral accident—cerebral accidents are very common, some come slowly, some come suddenly—it was his impression that it was a "residue [of a cerebral accident] of the past"—her malnutrition was a quality malnutrition which had been with her a long time.

The second witness was a physician and surgeon in general practice from 1923 to 1961. The decedent and her husband had been his patients for about seven or eight years. "Until 1953 they came to the office. But later they couldn't. I made it a rule every four to six weeks, I just came in and looked them up." In the early part of 1957, he treated her for her heart. It gradually got worse after he returned from a vacation in April or May, 1957. In response to a question "as to her mental condition and understanding things," he answered, "There was a time even before I went on a vacation her mental condition was a very poor one. It grew gradually worse. . . . I remember whenever I came I had to tell it to John [a brother-in-law], because I was sure she wouldn't remember anything about my instructions. Everything I wanted to be done, I had to speak specially to John, because William was still worse than her mentally. John was the only one who could remember. . . . I couldn't pinpoint when it started, but I think from the time I was on my vacation there was no question most likely she was not too good. I noticed she was forgetting, and at times she simply didn't remember anything."

73

He saw her at the hospital every day and treated her for the heart. His secondary diagnosis was generalized "arteriosclerosis, including everything, . . . the arteries of the brain are sclerotic, and if the brain doesn't lose that, it degenerates, and there was a gradual process that I had observed on her for years. Then of course the time comes when the damage is that much, with all the symptoms. She couldn't remember anything. . . . The brain gets soft and liquefies. If it is liquefied, it dies. Then all the symptoms are degeneration, a general process." In his opinion, the "condition that you found in this lady on the dates that she was in the hospital" was a permanent condition. In response to a question as to "her mental condition at the time that she was in the hospital," he replied, "she was senile . . . I couldn't give her any instructions." In his opinion, she did not have the mental capacity to make a will.

Cross-examination on arteriosclerosis and its effects showed that a large percentage of men and women of the age of the decedent were suffering from the condition, and that it varied from individual to individual. At the time she entered the hospital, she was suffering from congestive heart failure and not from a stroke. He denied saying "she is a very sick lady. Her physical condition is not good, but I think her mind is clear." "I never would have said that, because I stand on my record." As to the "varying" degree arteriosclerosis affects the mind, he stated, "But in this particular case, whenever I visited her, there was no lucid interval. I never could get in real touch with her." When questioned as to testifying "from your own memory," he stated he could testify without the chart. He could not recall whether he saw decedent on October 16, 1957. Her condition was improved as a result of her hospital stay, but he did not see or treat her after she left the hospital.

74

Plaintiffs' third witness was an attorney, Edwin D. Lawlor, who had represented William and Sophia Both for some years. He represented them in the negotiations for the sale of their farm land in 1957. The sales price of the farm was $90,000 and it was placed in a joint account. In September 1957, he visited them at their home "to consult with them about the revision of their estimate of their income tax." On October 14, 1957, he received a telephone call from defendant Nelson, who informed him that William Both was in the hospital and Sophia Both was at home "absolutely unable to take care of her affairs. . . . I am looking after their affairs. They requested me to do it." Defendant informed the witness that money was needed for hospital expenses, and "she can't do anything." The appointment of a conservator was discussed, and the witness said he would commence conservator proceedings for both William and Sophia.

On October 18, 1957, defendant Nelson called again to inquire what was being done, and the witness then prepared petitions to have both of them declared mentally incompetent, which were filed in the Probate Court on October 23.

In evidence is a letter from defendant Nelson, in Florida, to Lawlor, dated November 1, 1957, as follows: "Received a message that William Both is dead. Will be unable to attend the funeral. Greatly appreciate your cooperation in helping to manage the Both affairs. Would further appreciate advice from you as to what the situation is now. Has a conservator been officially appointed? And if so, who is it? If I can be of any assistance please write or phone. Thank you."

During cross-examination, letters were introduced on behalf of defendant from Lawlor to Nelson, dated October 23 and November 6, 1957, regarding the Probate Court conservator proceedings. The letter of

November 6 refers to the existence of "mutual wills," and further stated, "Your kindness and aid to the Boths in their very serious condition was of great benefit to them and I appreciate your help."

A summarization of the foregoing testimony, which covers a period of time immediately before and after the execution of the will of October 16, 1957, shows that during this period, Sophia Both was suffering from arteriosclerosis; she was senile; she could not remember anything; she had no lucid intervals; her attending physician could not "get in real touch with her"; and it was at defendant Nelson's instigation that conservatorship proceedings were commenced in order to secure money needed for the hospital expenses of William, because she was "absolutely unable to take care of her affairs."

Considering this evidence in its aspects most favorable to plaintiffs, together with all reasonable inferences to be drawn therefrom, we believe there is ample evidence tending to prove the lack of testamentary capacity of Sophia Both on October 16, 1957. We conclude plaintiffs established a prima facie case on the issue of lack of testamentary capacity. This determination makes it unnecessary for us to consider the question of prima facie proof of undue influence.

■ We now proceed to consider the contention of defendant that the verdict is contrary to the manifest weight of the evidence. To sustain the will either on the issue of lack of testamentary capacity or undue influence, defendant offered three witnesses. The first was the attesting witness, Sinkus. His testimony showed that he and the other attesting witness accompanied Nelson to the home of the testatrix, where Nelson greeted her with "Hi, Aunt Soph," and she replied, "These must be the men who have come to witness my will." She asked to see the will and appeared to be reading it for two or three minutes, and

76

then said, "That is fine. That is what I want." She asked for a pen and signed the will, which she then handed to Nelson saying, "You better take it." It was at the request of the testatrix that the attesting witnesses signed the will.

The second witness was Alma Linnemann, who operated a home in Elgin, Illinois, where the testatrix spent the last years of her life. Her testimony shows that defendant Nelson and Julius Kasser, her daughter-in-law's brother, made advance arrangements. On October 26, 1957, decedent arrived by ambulance and came in on a stretcher. She was a bedpan patient. Defendant Nelson arranged for her to have medical care. She remained in the Linnemann home until July 1959, when she was put into a hospital. Decedent received a Chicago paper and read it with a magnifying glass. She repeated what she read in the paper and talked about her relatives. She did not like them, because they did not take her in, and she had to go to a strange place. Decedent spent considerable time with her brother-in-law, John Both, who was at the same home, but did not trust him and never discussed her finances nor any private matters in his presence. She spoke highly about defendant Nelson, and that she had provided for him because he was so good to her. Decedent wrote many letters to friends and received many in return. She spoke about the fact that her farm had been sold for $90,000, and that the proceeds were being held for her by the Pioneer Trust & Savings Bank. Defendant Nelson telephoned from Florida once or twice every week to see how decedent was getting along. He wrote her many letters and was very solicitous of her. He never saw Sophia again.

Defendant's third witness was Viola Kampmeyer, a daughter of Mrs. Linnemann, who saw testatrix almost daily and assisted in caring for her. She testified that decedent was a pleasant, happy woman, who talked

intelligently and knew what she was doing; she was alert and sensible, read a newspaper daily, and commented about its contents; she wrote and received letters from friends, knew and mentioned by name her relatives and those of her husband; she knew the source and extent of her estate, and that it was being managed by Pioneer Trust & Savings Bank. Decedent said she thought an awful lot of Nelson; he had been good to her and he would be well taken care of. In the opinion of the witness, the decedent was sane, knew the nature of her estate, and the natural objects of her bounty.

█ In order for this court to determine that the verdict is against the manifest weight of the evidence, an opposite conclusion must be clearly evident or the verdict palpably erroneous or wholly unwarranted from the manifest weight of the evidence. A verdict will not be set aside merely because the jury could have found differently, or because judges feel that other conclusions would be more reasonable. We cannot say, as we must in order to reverse, that on the record before us an opposite conclusion is clearly apparent.

█ Defendant further contends that by reason of erroneous rulings made by the trial judge, very important testimony was improperly kept from the jury. The first of these rulings concerns the repeated refusal by the trial judge to allow defendant's witness Sinkus to answer the following question: "Now, in your opinion, was the testatrix of sound and disposing mind and memory at the time that she signed the instrument?" The basic objection made by plaintiffs to this question was that it called for an opinion by the witness Sinkus without sufficient foundation. As to this, defendant cites Brownlie v. Brownlie, 357 Ill 117, 191 NE 268 (1934), where our Supreme Court said (pp 122–123):

"The general rule that before a witness will be permitted to express an opinion as to the mental condition of a testator it is necessary for the witness to relate the facts and circumstances upon which he bases his opinion, and that whether a sufficient foundation has been laid then becomes a question of law for the court to pass upon before permitting the witness to express his opinion in case of an objection thereto, does not apply to attesting witnesses. Our statute requires the instrument to be attested by two witnesses and then provides what is necessary to be proved to admit the will for record in the probate court. The attesting witnesses are witnesses that the statute requires. They are in a sense placed there by the statute for the purpose of observing the method of the execution of the will and of determining whether the testator at the time is possessed of testamentary capacity. An attesting witness may form a belief or opinion of the testator's mental capacity from his appearance at the time he executed the instrument in controversy. . . . An attesting witness may be permitted to express an opinion as to the mental condition of the testator at the time the subscribing witness signed, without laying any foundation therefor. . . . such witnesses may be permitted to testify as to whether, so far as they were able to discern at the time of the execution of the will, the testator appeared to be under any undue influence."

In view of the statement made in the Brownlie case (p 123), that an attesting witness may be permitted to express an opinion as to the mental condition of the testator at the time the subscribing witness signed, "without laying any foundation therefor," we believe that the trial court should have permitted the witness to answer the question. However, we believe the non-

79

admission of his opinion is not reversible error here. The witness was permitted to testify liberally as to what he observed and heard while in the Both home, so that the jury were fully informed in this regard, and from which they could draw their own conclusions as to the testamentary capacity of the decedent.

█ Other rulings complained of concerned the direct examination of plaintiffs' witness, Dr. Haupt, who testified as to decedent's mental condition while he was treating her, and the remark of the court in denying an objection, "Well, that is an expert opinion." Defendant argues that "no attempt was ever made to qualify this witness as an expert on mental diseases or on anything else." Although the witness was of an advanced age, he testified at length as to what he saw and observed professionally as to the decedent. We believe the initial qualification of the witness was sufficient to permit his observations and opinion as to the mental condition of the decedent to stand. While the remark of the court might have been misconstrued by the jury, we doubt it had any significant effect on their ultimate conclusion. We find no prejudicial error here.

█ Defendant also contends that the trial court "prejudicially refused eight of defendant's ten tendered instructions." We have examined the instructions, both given and refused. It appears that each of defendant's instructions has legal precedent and, if not repetitious, might have been properly given to the jury. However, we believe the instructions which were given to the jury were sufficient and adequate to inform the jury of the essential legal issues and the fact determinations to be made. We conclude that the instant trial was free from prejudicial trial errors, and that the instructions, taken as a series, adequately instructed the jury as to the issues involved.

For the reasons stated, the decree appealed from is affirmed.

Affirmed.

ENGLISH, P. J. and BURMAN, J., concur.