JAMES KELLEY et al., Plaintiffs-Appellees, v. THE FIRST STATE BANK OF PRINCETON et al., Defendants-Appellants.

Third District  No. 79-281

Opinion filed February 13, 1980.—Rehearing denied March 25, 1980.

Paul Perona, Jr., and Thomas Perona, both of Perona, Perona & Tonozzi, of Spring Valley, and Johnson, Martin & Russell, of Princeton, for appellants.

Lenn C. Goldsmith, of Boyle & Goldsmith, of Hennepin, for appellees.

Mr. PRESIDING JUSTICE ALLOY delivered the opinion of the court:

This was a will contest action by plaintiffs James Kelley, Ruth Ann Kelley, and the United Methodist Church of Malden to set aside a 1974 trust agreement, will, codicil, and certain gifts of the decedent Hazel Ware.

The Kelleys, brother and sister, and the church stood to inherit a large portion of Hazel Ware's estate under a 1965 will of Hazel Ware, which would apparently be effective if the 1974 instruments were declared invalid and set aside. A jury was requested by plaintiffs for the trust portion of the suit, and was demanded for the will and codicil issues. After a lengthy trial, the jury returned verdicts, in favor of the plaintiffs, setting aside the trust agreement, will, codicil, and certain gifts made by Hazel Ware. Further verdicts found that certain other gifts by Hazel Ware were valid. As to the equitable matters, the jury was sitting in an advisory capacity only. The trial judge found in accordance with the jury verdicts and entered judgment consistent therewith.

The defendants, Frank M. Bettasso, Sr., Rita Bettasso, Michael S. Bettasso, Frank M. Bettasso, Jr., George E. Bettasso, Janelle Bettasso, John Francis Scott, Josephine Scott; Frank Bettasso, Sr., and First State Bank of Princeton, as trustees under a trust agreement, and The First State Bank of Princeton, as executor of the estate of Hazel M. Ware, appeal from the verdicts of the jury and the judgments of the trial court adverse to such appellants. They raise numerous issues, addressing in them the standing of the plaintiffs, the inconsistency of the verdicts, the evidentiary support for the verdicts, certain rulings on pretrial motions on the pleadings, numerous evidentiary matters, and certain instructions. Eight issues are purported to be covered, although when separate subissues are properly included, more than 20 separate issues are raised. The briefs of the parties are, respectively, 107 and 150 pages in length. The record is 9 volumes and the report of proceedings in the trial court spans 23 volumes. An abbreviated summary of the facts (which consumed better than half of each brief) will be set forth initially, and the other facts will be brought forth as pertinent to the discussion of the issues raised.

Hazel M. Ware died January 18, 1975, owning substantial real estate and personal property. The plaintiffs are the principal beneficiaries under three wills and a codicil executed by Hazel Ware in the years 1963 and 1965. As noted, the individual defendants, Frank and Rita Bettasso, are the principal beneficiaries under a trust, pour-over will and codicil executed by Hazel Ware in 1974. The other Bettassos, children of Frank and Rita, were recipients of gifts from Hazel Ware during her lifetime. As noted, the plaintiffs brought suit to set aside the trust, pour-over will, and the codicil, as well as certain gifts, asserting that the same had all been the result of undue influence upon Hazel Ware by Frank Bettasso, Sr. An allegation in the will contest complaint also challenged the mental competency of Hazel Ware at the time of the execution of the 1974 documents.

At the time of her death in 1975, Hazel Ware was 81 years of age and owned considerable real estate in Bureau County. She owned a 180-acre

farm, known as the Ware farm, and also a 150-acre farm, known as the Bracken farm, as well as substantial stocks, bonds, savings and checking accounts. Her net estate, before taxes, was appraised at upwards of $600,000. At the time of her death, Hazel Ware was survived by no close relatives. Her husband had died in 1963, an aunt (a former owner of the Bracken farm) died in 1964, and her sister died in 1971. A friend and house companion, as well as aunt by marriage, Suzie Snow, died in 1972. The parties to this lawsuit are not related by blood to Hazel Ware. Plaintiffs James and Ruth Kelley are the children of Frank Kelley, a long-time friend and farm hand of Ed and Hazel Ware, who predeceased Hazel Ware by one day. Defendant Frank Bettasso, Sr., was a friend of Hazel and Ed Ware, who after Ed's death handled Hazel's business affairs and, later, much of her personal affairs. Rita Bettasso is Frank Sr.'s wife, and the rest of the individual defendants are the children of Frank and Rita Bettasso.

In the two years following the death of her husband in 1963, Hazel Ware executed three wills and a codicil. They were substantially the same with regard to devisees and legatees. The will of December 31, 1965, the last of the three, left certain securities outright to James and Ruth Ann Kelley. The Ware farm, after the death of Suzie Snow and Josephine Palmquist (Hazel's sister), was left in trust to Frank Kelley for life, then to his children James and Ruth Ann for life, and then to the United Methodist Church of Malden and the Antioch Presbyterian Church of Cyrene, Missouri. The Kelley children were also the beneficiaries under the residuary clause of the will. Under that clause, if the will of 1965 were to be found to be the last valid will of Hazel Ware, they would acquire the 150-acre Bracken farm, to which Hazel Ware acquired full interest upon the death of her sister in 1971.

The 1974 documents, over which the principal dispute centers in this action, consisted of a trust agreement and pour-over will, executed by Hazel Ware on May 24, 1974, and a codicil, of October 3, 1974, which republished the will. Also at issue in the suit were certain gifts allegedly made by Hazel Ware to Bettasso family members during the years 1972-1975. We shall return to the gifts later in the opinion. The trust agreement of May 24, 1974, provided that upon Hazel Ware's death, John and Josephine Scott, former tenants on the Bracken farm and friends of Hazel Ware, were to receive the Bracken farm. It also provided that $125,000 was to be placed in trust, with the income to Frank Kelley during his lifetime and the remainder to James and Ruth Kelley, Frank's children. The Ware farm and the remainder of her estate were given to Frank and Rita Bettasso, upon the death of Hazel Ware. Frank Bettasso and The First State Bank of Princeton were named trustees. Bettasso was a director at the bank. The will, also executed on May 24, 1974, named the

First State Bank as executor and essentially poured any assets of her estate not then in the trust into the trust at her death. The codicil was executed on October 1, 1974, and was drawn up to provide for the manner of her burial, which had apparently been omitted from the previous will of May 24, 1974.

It was these three documents which the plaintiffs challenged as being the product of undue influence and as being executed without the requisite testamentary capacity. The jury and the trial court found for the plaintiffs and set aside the documents. Before going to the issues and the evidence pertinent to them it is useful to note that when determining whether the findings of the court are supported in the evidence, we may not substitute our judgment on the evidence for that of the factfinder, who was in the best position to judge the credibility of the witnesses and to determine the weight of the evidence. (*Rhodes v. Sigler* (1975), 27 Ill. App. 3d 1, 3, 325 N.E.2d 381.) As therein stated,

> "[W]here, as here, several reasonable inferences are possible from conflicting testimony, we are obligated to accept those which support the trial court's order."

With this obligation in mind we turn to an examination of the pertinent evidence bearing on the questions of undue influence and mental capacity with regard to the 1974 documents.

Hazel Ware was 80 years old in 1974. She had a breakdown in 1966, suffering from severe depression, which required her hospitalization during that year for almost four months, under the care of Dr. Irving Turow at the mental health unit of St. Francis Hospital in Peoria. She continued under Dr. Turow's care until her death in 1975, suffering further serious problems in 1972. Dr. Turow had her on a drug program to combat the depression and he saw her for counseling up until her death. She was on a variety of drugs during the months February through June 1974 and during October 1974. She had other health problems, including eye trouble from 1971 onward, for which she saw an optometrist. She suffered from heart problems, the most serious attack occurring in late December 1973, for which she was hospitalized for several weeks. During 1974, she was in and out of hospitals and nursing homes, spending only the months March through June at her farmhouse. The testimony concerning her mental condition during the year 1974, and specifically in May and October, was conflicting and contradictory.

Several nurses who attended to her while she resided at Colonial Hall nursing home from January through March testified that Mrs. Ware was weak, had problems with her balance, and was often confused. Rose Chilausky, one of the nurses, testified that Hazel Ware was disoriented much of the time and had problems with her memory. Chilausky was of the opinion that Hazel Ware was not of sound mind and did not have the

ability to conduct any business. She did not feel that Hazel Ware had the ability to know the nature and extent of her property. Another witness, the Reverend Harold Burkey, who saw Hazel Ware on February 27, 1974, at the nursing home, testified that she did not know where she was. He stated that she was not fit to conduct any business at that time. Dr. Irving Turow, who had Mrs. Ware as a patient for her mental problems from 1966 until her death in early 1975, saw her on May 16, 1974, just eight days before the trust agreement and will were executed. He testified that on that date she did not know where she was staying. He testified that she had impaired cognitive capacity such that he doubted whether she had the capacity to know the nature and extent of her property or the natural objects of her bounty. He further testified that she had no ability to conduct any business or her affairs at that time. He questioned whether she would have been able to understand the details of any document, but he did state that she would have known she was signing a will.

In June 1974, Hazel Ware was admitted to Perry Hospital, after a fall and dizzy spells. After a week at the hospital, she returned to Colonial Hall, and then for the first three weeks of August, she remained in the mental health unit at St. Francis Hospital under Dr. Turow's care. After leaving St. Francis, she returned to Colonial Hall and was there until her death in January 1975. Her last stay at St. Francis was for agitated depression. Dr. Turow stated that, during that stay, her cognitive capacity was continuing to decrease. He testified that he doubted she had the ability to understand that she was providing for disposition of her property by a document. He also reiterated his testimony concerning her ability to know and understand the nature and extent of her property or the natural objects of her bounty. He further testified that she was behaving in a very dependent manner during this stay, which was consistent with her problem. She indicated to Dr. Turow that her business affairs were all handled by Frank Bettasso, Sr. At the last meeting between Dr. Turow and Hazel Ware, on September 18, 1974, a month prior to the execution of her codicil, Turow found her further deteriorated and depressed. As to her condition at Colonial Hall, after leaving St. Francis, Rose Chilausky testified that she was not of sound mind, did not have the ability to know and understand the nature and extent of her property and did not have the ability to conduct business affairs.

In addition to the testimony of the witnesses above discussed there was testimony from both Madge Kelley, Frank Kelley's widow, and plaintiff Ruth Ann Kelley that Hazel Ware was in failing health during the early months of 1974.

Opposed to the substance of the evidence above set forth on Hazel Ware's testamentary capacity in May and October of 1974, there was the testimony of a number of defense witnesses, all of whom testified that

Hazel Ware was of sound mind during the time in question and fully capable of making and understanding the will, trust agreement, and codicil. Such was the testimony of Frank Bettasso, Sr., and his wife and children, who saw Hazel Ware frequently during these months. That was also the testimony of Fred Potter, who drew up the will, trust agreement and codicil, and of his associate and secretary who had limited contact with Mrs. Ware. It was also the testimony of the administrator of the nursing home, several other nurses at the home, and Mrs. Ware's dentist and optometrist. No useful purpose is served by going into the details of their testimony. Summarizing, all their conclusions as to her soundness of mind and cognitive capacity were supported by their other testimony.

Turning then to the evidence as to undue influence, it must be noted that plaintiffs' evidence of Hazel Ware's mental and physical condition during the months of 1974 also has a relevancy. In addition to that evidence of her condition, there is the evidence of the longstanding relationship between Mrs. Ware and Frank Bettasso, Sr. In 1963, after the death of her husband, Frank Bettasso, Sr., a former friend of Ed Ware and a social companion of both Hazel and Ed Ware, began handling Hazel Ware's business affairs. Hazel had never actually managed the farm or the financial interests, as that had been done by her husband during his life. From the record, it appears she was not conversant with the business and financial affairs nor skilled in such matters. She maintained and used a personal checking account for household items, gifts and miscellaneous purchases.

In June 1965, Frank Bettasso, Sr., was given general power of attorney by Hazel Ware. He was also named as trustee and executor in the wills made by Hazel Ware in 1965, including the December 31, 1965, will. Bettasso, who was 50 at the time of trial, ran a successful insurance and real estate business in Princeton. His work on behalf of Hazel Ware consisted in his managing her affairs in considerable detail over the years. He aided her in decisions on the farm and collected the landlord's share of the farm income. He collected the dividends from her stock and bond holdings. He paid her business and household bills, and acted as both business manager and accountant concerning her holdings. After 1971, he personally kept her bookkeeping records and prepared or helped to prepare several of her income tax returns. She requested that he act as administrator of her sister's estate, in 1971, which he did. In addition, over the years Bettasso began to help Hazel Ware manage many of her personal affairs, especially after the death of her sister, and then her house companion and friend, Suzie Snow, in 1972. He arranged for doctors' appointments and often took her to such appointments. When she would become ill or injured, Bettasso arranged for her entry into a hospital, at

times convincing her of the necessity for such admission. He arranged for her entry into Colonial Hall and took care of consents and admissions. During 1974 he was a frequent visitor to Hazel Ware, wherever she was staying. He continued during 1974 to arrange for her business and personal affairs. There is ample evidence that during these months, and from at least 1973, Hazel Ware was extremely dependent upon Frank Bettasso, Sr., for conducting the affairs of her life. When Dr. Foresman, who attended her during her first stay at Colonial Hall in early 1974, advised her of her serious condition and asked whether she had a will, she responded that Mr. Bettasso took care of such matters for her. Dr. Turow also testified that Hazel Ware told him that her business affairs were left up to Frank Bettasso, Sr.

Other evidence forming a basis for a finding of undue influence on the part of Frank Bettasso, Sr., includes testimony that he suggested to Hazel Ware that she change attorneys, from the man who had handled her affairs and those of her husband in the past, to Fred Potter. It was Potter who drew up the trust, will and codicil of 1974 and also prepared gift-tax returns for the gifts made by Hazel Ware. Bettasso denied that he suggested Potter to Hazel Ware. Other evidence indicated that Potter also handled legal matters of both business and personal nature for Frank Bettasso, Sr. Prior to January 1975, Potter considered himself Bettasso's personal attorney. Potter was originally retained by Bettasso in defense of this lawsuit, although he later withdrew. There was evidence in the record, contradicted by Bettasso's testimony, that it was Bettasso who notified Fred Potter of Hazel Ware's wishes concerning the trust. While contradicted, such evidence is consistent with the weight of the evidence indicating that Bettasso handled business and financial affairs for Hazel Ware and that she left "such matters" to him.

As to the documents and the manner of their execution, in the offices of Frank Bettasso, Sr., Bettasso testified that he did not see the documents prior to the time that Hazel Ware executed them on May 24, 1974. Yet, there was the matter of certain handwritten dates, inserted on both the trust agreement and the pour-over will. Bettasso, in his deposition, had denied making the insertions, consistent with his denial of any foreknowledge of the contents of the documents. Attorney A. Randolph Comba, Potter's partner and stand-in during the execution of the documents on May 24, 1974, testified in his deposition that the inserted dates and numbers were in his handwriting. However, after learning that an expert handwriting analyst had examined the documents, Comba recanted at trial, denying they were made by him. He did not know who had made the insertions. The expert brought in by plaintiffs testified that the insertions were in the handwriting of Frank Bettasso, Sr. Bettasso, Sr., at trial, testified that he didn't know or couldn't recall if he had made the

insertions. In addition, the document expert testified that certain handwriting samples given by Bettasso, Sr., at his deposition were not consistent with other, unsolicited evidence of his handwriting.

Finally, with respect to plaintiffs' evidence on the issue of undue influence, there was testimony from three witnesses that Hazel Ware during 1974 told them that the Ware farm was going to the Kelleys. Two of those statements occurred after the execution of the trust agreement and will which had given the Ware farm to Bettasso and his wife.

As to the defense version, no useful purpose would be served by setting it forth in detail. Suffice it to note that Potter testified that decedent had come in to talk to him about a revocable trust a week or 10 days prior to May 24, about the same time as Dr. Turow saw her on May 18, 1974. Potter indicated that he went over its provisions with her. Comba testified that on the day of execution, he went over the will with her, out of the presence of Wilson, the trust officer of First State Bank, and Bettasso. Wilson, according to his testimony, went over the trust document with her. Bettasso, as can be gleaned from his denials of plaintiffs' evidence, denied influencing Hazel Ware with regard to the documents and denied, as noted, foreknowledge of their contents. Comba, his secretary, Wilson, and Bettasso all testified that when they met with Hazel Ware in Bettasso's offices on May 24, that she spoke well, responded to questions and conducted herself as a normal person.

■■ Having set forth a summary of the evidence sufficient for us to proceed, we turn to appellants' catalogue of issues. The defense filed a motion for summary judgment (which properly should have been a motion for dismissal under section 48(1)(b) of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 48(1)(b)) in the trial court, asserting that the plaintiffs had no standing to bring the will contest. The basis of their argument was that there had been a March 1, 1973, will by Hazel Ware, which will, according to attorney Potter who allegedly drew such will, had revoked all prior wills. That would, of course, have included the December 31, 1965, will under which the plaintiff Kelleys stood to inherit a large portion of Hazel Ware's estate. The argument apparently is that the Kelleys are not heirs at law, and that they must rely on the December 31, 1965, will. Since that will was revoked by the nonexistent March 1, 1973, will, the defense arguments assume the plaintiffs, therefore, have no right to contest the 1974 will and trust agreement. Section 8—1 of the Probate Act (Ill. Rev. Stat. 1977, ch. 110½, par. 8—1), the will contest provision of the Act, states:

> "Within 6 months after the admission to probate of a domestic or foreign will in any court of this State, any interested person may file a petition in the proceeding for the administration of the testator's estate to contest the validity of the will. * * *"

It has been found, expressly, that devisees and legatees of a prior will of the decedent, even though not heirs at law, are "interested persons" within the meaning of this section. (*In re Estate of King* (1968), 91 Ill. App. 2d 342, 348, 235 N.E.2d 276; *Wilson v. Bell* (1942), 315 Ill. App. 418, 425, 43 N.E.2d 162, citing *Cassem v. Prindle* (1913), 258 Ill. 11; *cf. In re Estate of Lipchik* (1975), 27 Ill. App. 3d 331, 326 N.E.2d 464.) There is no question that plaintiffs, as devisees and legatees under a prior will, have a direct, pecuniary, existing interest which would have been detrimentally affected by the probate of the 1974 will and trust. They are interested persons and were entitled to contest the 1974 documents.

▮▮ The next issues raised address questions of whether the verdicts of the jury and the judgments were contrary to the manifest weight of the evidence. It is noted that neither the jury nor the court delineated the bases for their findings and judgments. We find no error herein and that both a lack of testamentary capacity and undue influence were supported by evidence. It has long been established that testamentary capacity requires "sufficient mental ability to know and remember who are the natural objects of his bounty, to comprehend the kind and character of his property and to make disposition of the property according to some plan formed in his mind." (*Beyers v. Billingsley* (1977), 54 Ill. App. 3d 427, 437, 369 N.E.2d 1320.) It is the defense argument that there was but meager evidence in the record to establish Hazel Ware's lack of such testamentary capacity at the time of the making of the will, trust and at the time of the codicil. We disagree. The evidence heretofore summarized was fully sufficient for the jury to have concluded that at the time of the execution of those documents, in May and October of 1974, Hazel Ware did not have the requisite testamentary capacity. No purpose would be served by repeating the evidence again. Similarly, the evidence in the record is sufficient to support a conclusion by the trier of fact that the instruments were the result of undue influence exerted upon Hazel Ware by Frank Bettasso, Sr., and should be set aside on that basis as well. It is noted that "[t]he undue influence necessary to set aside a will must be of such a nature as to destroy the testator's freedom concerning the disposition of his estate and render his will that of another." (*Breault v. Feigenholtz* (1973), 54 Ill. 2d 173, 181, 296 N.E.2d 3.) Such undue influence depriving the testator of free agency and rendering the will more that of another than his own must be directly connected with the execution of the will and operate at the time the will is made. (*Flanigon v. Smith* (1929), 337 Ill. 572, 169 N.E.2d 767.)

> "In certain circumstances a presumption that the will is the result
> of undue influence will arise. To raise this presumption, the
> contestant must prove the following elements: (1) that a fiduciary
> relationship exists between the testator and a legatee or devisee

who receives a substantial benefit from the will; (2) that the testator is the dependent party and the devisee or legatee is the dominant party; (3) that the testator reposes trust and confidence in the devisee or legatee; and (4) that the will is prepared by or its preparation procured by such devisee or legatee." (*In re Estate of Ariola* (1979), 69 Ill. App. 3d 158, 168, 386 N.E.2d 862.)

The evidence in the record on the question of undue influence, which evidence has been previously recited, is sufficient to support a conclusion by the trier of fact that the documents in issue were the product of undue influence on the part of Frank Bettasso, Sr. There is sufficient evidence to support a conclusion that the testamentary documents executed by Hazel Ware were not the product of her free agency but were the product of undue influence which rendered them more those of Frank Bettasso than of Hazel Ware. There is also sufficient evidence to raise the presumption of undue influence and support such a finding. It is true that contrary evidence was presented and that the credibility of many of the plaintiffs' witnesses was attacked. However, as noted, such questions of credibility and weight are properly for the trier of fact, and we as an appellate court are not free to substitute our judgment, where the judgments of the court below are supported, as they are here, in the record. The evidence was sufficient to support findings of undue influence and a lack of testamentary capacity as to the trust agreement, will and codicil.

The defense contention that the jury verdicts were inconsistent because of the findings with regard to the gifts is unconvincing. The jury found valid various gifts to the Bettassos made on March 16, 1972, November 23, 1973, and April 4, 1974. They found invalid the trust and will of May 24, 1974, the codicil of October 1974, and gifts of December 3, 1974, and January 2, 1975. We find no inconsistency in these verdicts by the jury, as the jury may well have found pivotal the testimony of Dr. Turow, whose testimony included opinions as to Hazel Ware's mental condition on May 16, 1974, after the last valid gift, but prior to the trust, will and subsequent gifts.

■■ The defense next forcefully argues that kindness and affection cannot constitute undue influence. It need only be noted that the issue is whether the will or testamentary document was made by the testator exercising her own free will or whether there was undue influence by another such that the document was more that of the other than Hazel Ware. If kindness and affection result in overcoming the testator's free agency and leave the will that of the beneficiary rather than the testator, then such constitute undue influence. In the instant case, however, the evidence was found by the court to establish considerably more than just kindness and affection on the part of Frank Bettasso, Sr. We cannot substitute our conclusion for that of the finder of fact in the trial court.

■■ The argument that any undue influence by Frank Bettasso, Sr., should not invalidate the gift to Josephine Scott in the trust agreement is not convincing. When undue influence is found, it invalidates the whole instrument, and not just those provisions benefiting the person found guilty of such influence, unless contrary findings are made with respect to various provisions of the instrument. (*Snyder v. Steele* (1922), 304 Ill. 387, 136 N.E.2d 649.) We need not reach that conclusion, however, for in this case the finding of lack of testamentary capacity would invalidate the entire testamentary disposition. We cannot, on appeal, on the record, reject the determination by the trial court.

■■ Next, a number of issues are raised with regard to pretrial motions. The first of these is the defense contention that the court improperly denied defense motions to strike the jury demand of plaintiffs. We find no error in the court's refusal to strike the jury demand. The plaintiffs original suit challenged the trust, pour-over will and the codicil in an equitable action for which no right to a jury exists. That suit was necessitated because defendants had not, then, probated the 1974 will and codicil. After the will and codicil were probated, plaintiffs sought to move their equitable action from the chancery docket to the probate court. The defendants opposed such a move. The trial judge hearing the case denied the motion to transfer and allowed a motion to dismiss, generally, with leave to file an amended complaint. Plaintiffs responded by promptly filing a complaint in the probate proceedings, which complaint challenged all of the instruments in question as an original will contest, with side equitable issues. That complaint contained a demand for the jury as to the will and codicil and a request for an advisory jury as to the equitable matters. We note that a jury is a matter of right in a will contest and a matter of the trial court's discretion in equity litigation. (Ill. Rev. Stat. 1977, ch. 110½, par. 8—3; Ill. Rev. Stat. 1977, ch. 110, par. 63.) It is clear that in their original complaint in the will contest action the plaintiffs demanded a jury. We find that the demand was made at an appropriate time in the will contest suit. Coupled with that demand as to the will matters was a request for a jury as to the equitable matters included in that action. We find no error in the court's allowance of the jury, for advisory purposes, as to the equitable portion of the suit. Even assuming, *arguendo*, the untimeliness of the request, we would find no prejudice in light of the fact that the court would have been within its allowable discretion in directing the equitable issues to be tried by a jury. Ill. Rev. Stat. 1977, ch. 110, par. 63.

■■ The defense next asserts that they should have been able to invoke the dead man's act (Ill. Rev. Stat. 1975, ch. 51, par. 2) in the trust portion of the suit. They filed a motion *in limine* seeking, among other things, to prohibit any evidence or mention of "the subject matter and content of

any conversations between the decedent Hazel Ware and any other person." The motion was denied as to that request. Later, at trial, defense counsel objected to the testimony of Madge Kelley, the Kelley children's mother, on the basis of the dead man's act. The court overruled their objection. So far as the record shows, that is the only objection, based upon the act, which was made at trial by defense counsel. Yet, no error is alleged with respect to that ruling concerning Madge Kelley, who did not stand to take anything under any of the wills. We find that the defense failure to object to any other witness' testimony on grounds of the dead man's act waives the issue as to those persons. *In re Estate of Netherton* (1978), 62 Ill. App. 3d 55, 378 N.E.2d 800.

■■ We note that the motion *in limine*, as regards the dead man's act, sought by its terms to prohibit conversations between the decedent and any person, while the act only prohibits conversations between the decedent and interested persons. Thus the attempt to utilize the act by way of motion *in limine* was too broad and thereby ineffectual. Under the circumstances, it was incumbent upon defense counsel to make specific objections on that basis as to individual witnesses called by plaintiffs. They did not do so. They state that they did not deem it necessary to make further objection, given the consistent rulings of the court on the issue. However, the motion *in limine* was too broad in its terms and the objection to Madge Kelley, the only one made at trial, was properly overruled. We find no sufficient basis in the record for their alleged conclusion that they deemed it unnecessary to make further objections. In this regard, we would note that they made numerous other objections, at trial, on other evidentiary matters covered and denied in the motion *in limine*. We would also note that the defense presented testimony from the defendants as to conversations and statements by the decedent Hazel Ware. As to their suggestion that it would have availed them little to have the act enforced as to the will action, but not as to the trust portion, because of the inefficacy of any limiting instruction, it should be mentioned that, if properly invoked, the court could have heard the evidence bearing on the trust portion and the gifts outside the presence of the jury.

■■ ■ The defense also sought, by way of motion *in limine* fully supported by objections at trial, to have barred any testimony and mention of any wills or codicils of Hazel Ware executed on or before December 31, 1965. The court denied the pretrial motion and at trial, over defense objection, admitted three wills of Hazel Ware made in 1963 and 1965 and a 1965 codicil. Plaintiffs argue that these wills were irrelevant, given that they were executed 11 and nine years prior to the documents in question in the will contest action. The wills were properly admitted. Initially, it must be noted that the wills each stood to establish the plaintiffs as

interested persons, thereby entitling them to contest the probated will and the trust instrument. (Ill. Rev. Stat. 1975, ch. 110½, par. 8—1.) The defense, as noted in a previous discussion, raised an objection to plaintiffs' standing. Secondly, the prior wills were properly admitted into evidence, even though inconsistent with the probated will, in support of the charge of undue influence, because they tended to show a change in a long-established testamentary scheme. (*Blackhurst v. James* (1922), 304 Ill. 586, 602, 136 N.E.2d 754.) There the court notes the general rule to the contrary, that only consistent wills are admissible (*O'Day v. Crabb* (1915), 269 Ill. 123, 130), but also states the exception where facts support a finding of undue influence and the prior wills serve to establish a long-standing disposition scheme subsequently modified under questionable circumstances. There was no reversible error in the court's admission into evidence of the prior wills of Hazel Ware.

■■ The defense also sought, by way of motion *in limine* later supported by objection at trial, to exclude certain "remote and irrelevant" evidence. We have reviewed the objected to evidence. Without cataloging these various evidentiary matters, an exercise of little value, we find that such were within the broad discretion of the trial court. While we, sitting as a circuit court, might have had some reservations concerning the relevancy of some of the items (certain old photos and Frank Kelley's old income tax returns, as examples), we find no reversible error in their admission, given ample evidence indicating sufficient basis to set aside the documents and the fact that much of the objected to evidence was repetitive of testimony in evidence or reasonable inferences from that testimony. Concerning the evidence of Hazel Ware's physical and mental condition in 1966, we find that such evidence was properly admitted as relevant to the issues before the court, given the nature and length of her problems. In addition, the jury was instructed that it ought not consider whether Hazel Ware had made a wise disposition of her property. Given the nature of the evidence admitted, the strength of other evidence on the questions of testamentary capacity and undue influence, and the jury instructions focusing the attention of the jury on the execution of the 1974 documents, we cannot say that any reversible error occurred with respect to the evidence. It is appropriate, at this time, to note that "[t]he ultimate question here is not whether the trial was scrupulously free from error, but whether any error occurred which operated to the prejudice of the defendant or unduly affected the outcome below." *Nelson v. Union Wire Rope Corp.* (1964), 31 Ill. 2d 69, 118, 199 N.E.2d 769.

■■ We proceed now to evidentiary rulings of the court alleged to have been prejudicial and erroneous, over which no motion *in limine* applied. The first issue hereunder concerns the court's refusal to allow defense counsel to cross-examine three of plaintiffs' witnesses (Rev. Burkey,

Dr. Turow, and a friend of Hazel Ware) on the issue of whether they had any knowledge of any undue influence on the part of Frank Bettasso, Sr. The questions asked called for conclusions from those witnesses on the ultimate issue of undue influence, without counsel first having laid a sufficient and proper foundation for such conclusions. The objections were properly sustained. The finding of lack of testamentary capacity would obviate the effect of any error in this regard.

■■ We find no error in permitting plaintiffs' counsel to cross-examine defense witness Ann Bell using medical records. Ann Bell, a nurse at Colonial Hall, testified to her observations of Hazel Ware during Mrs. Ware's stay at the nursing home. Bell's conclusion was that Mrs. Ware was competent and had the requisite testamentary capacity. On cross-examination, the court permitted counsel to utilize certain daily records kept at Colonial Hall on Hazel Ware's condition. The records were weekly summaries, many made by Nurse Bell, of daily notes, made by her and other nurses, on the condition of Hazel Ware. These summaries contained statements about Hazel Ware that were inconsistent with the witness' direct testimony. The trial court partially sustained defense objection to such cross-examination, but it ruled that the summaries could be used to test the witness' powers of observation or credibility. The jury was given an appropriate limiting instruction. We find that such examination was proper for the limited purpose allowed. (*Cf. Flynn v. Troesch* (1940), 373 Ill. 275, 282, 26 N.E.2d 91.) Also, it must be noted that the substance of the summaries, which the defense finds so prejudicial, was only repetitious of what other direct testimony had shown concerning Hazel Ware's condition while at Colonial Hall.

■■ The defense next attacks as error the admission of certain conclusions by Dr. Turow which were addressed to the issue of Hazel Ware's testamentary capacity in 1974. They argue that the court erred in allowing Dr. Turow to testify as to Hazel Ware's cognitive capacity, which he defined as her ability to know in the broad sense. It is asserted that only opinions as to a testator's sound mind and memory, ability to know the nature and extent of his property, and ability to transact ordinary business are proper. They assail "cognitive capacity" because it is a relative, as opposed to an absolute, term. They also object that he was allowed to give his opinion of her mental state on May 24, 1974, when he had only seen her on May 18, 1974, and again on July 29, 1974. As to the latter point, we find that Dr. Turow was competent to give his opinion on Hazel Ware's mental condition as of May 24, even though he had not seen her on that day. He had intimate, expert knowledge of her mental condition, which condition, we note, was not the type to improve in such a short period of time, if at all. His conclusion as to her mental health throughout 1974 was that it was deteriorating. Neither was there error in his use of the

term "cognitive capacity," given that in addition to that he also testified as to his opinion of her mental condition with regard to the established standards as to testamentary capacity.

■■ Neither was there error in the court's refusal to allow defense psychiatrist Marvin Ziporyn to answer a hypothetical question as to whether a long argument with a man who was a farm laborer or tenant of Hazel Ware for 47 years could have resulted in depression for her. The court properly refused to allow such question, for it was improper in that it did not contain any of the other, established background factors pertaining to the causes of Hazel Ware's depression. (*Christianson v. City of Chicago Heights* (1968), 103 Ill. App. 2d 315, 322, 243 N.E.2d 677.) We also note that the defense could have included such background medical facts and reframed the question.

■■ As to the court's refusal to allow Dr. Foresman to answer a question by the defense on the susceptibility of someone suffering from depression to influence by another, we find no error. The question went beyond the scope of the direct examination, which had not elicited any medical opinions on the mental condition of Hazel Ware. Additionally, the question was not addressed as to Hazel Ware in particular, but was general in nature.

■■ Several issues are raised in connection with the cross-examination of defendant Frank Bettasso, Sr. We find no error in permitting a question to him as to whether he recommended to Hazel Ware that she see an attorney other than Potter concerning her will and the trust of May 1974. The evidence in the record was susceptible of a reasonable inference that Potter and Bettasso had a close relationship as regards business matters. In this circumstance, coupled with Bettasso's own relationship with Hazel Ware, the jury could properly consider whether she had independent advice before executing the will and trust. Neither do we find reversible error with regard to the rulings of the court concerning questions to Bettasso on Frank Kelley's leg accident.

There was no error in sustaining an objection to a question asked of plaintiff James Kelley concerning Hazel Ware's condition in June 1974, at a time he received a gift from her. The evidence indicated that he received a present by mail and did not see her at that time. Nor was there reversible error in the court's ruling on an attempt by the defense to impeach Rev. Burkey. The interest and bias of the witness was amply brought forth and the question would have only been cumulative.

■■ The next assigned errors concern the admission of certain exhibits into evidence or the failure of the court to admit certain exhibits. At the end of the trial, the defense offered into evidence the full and complete transcript of the proof of will and codicil in the estate of Hazel Ware. The court, upon plaintiffs' objection, refused to admit it, and later admitted it

with certain portions excised. The excised portions were those concerning questions put to subscribing witnesses on undue influence, coercion, duress and persuasion. The defense now contends that it was error not to have admitted the full and complete transcript. We agree, although we find the error harmless in this case. Section 8—3 of the Probate Act (Ill. Rev. Stat. 1977, ch. 110½, par. 8—3) states that:

> "An authenticated transcript of the testimony of any of the witnesses taken at the time of the hearing on the admission of the will to probate is admissible in evidence [in a will contest suit]."

That the transcript contained conclusions by the subscribing witnesses on an issue in the will contest suit would not alter its admission, given the admissibility of such conclusions. (*Brownlie v. Brownlie* (1934), 357 Ill. 117, 123, 191 N.E. 268; *Both v. Nelson* (1964), 46 Ill. App. 2d 69, 78-79, 196 N.E.2d 530.) However, we find that any error in excluding the subscribing witnesses' statements on the lack of undue influence is harmless. Initially, there was ample other testimony on that question supportive of the defense position. Secondly, there is the witnesses' positions within attorney Potter's offices and their limited contact and knowledge concerning Hazel Ware. Finally, as noted on other matters, such error would have no effect upon the question of testamentary capacity, which issue alone would support the judgments entered. Accordingly, we conclude that any error in refusing to admit the full transcript was harmless.

■■ The defense next argues that the court erred in allowing into evidence certain handwriting samples given by Frank Bettasso, Sr., at his deposition. As noted earlier, there was a question as to who had made certain handwritten insertions on the will, trust, and codicil documents. A handwriting expert was permitted to testify that the insertions were made in the handwriting of Frank Bettasso, Sr., a conclusion initially denied by Bettasso. The expert was also permitted to testify that there were substantial discrepancies between the samples given at the deposition and his true handwriting as evidenced by numerous other unsolicited examples. Objection to the latter testimony is based upon an argument that it has no probative value as to the insertions and prejudiced the Bettasso family and Josephine Scott, another beneficiary under the 1974 trust and will. We find no error in the admission of the evidence which had direct relevancy and materiality on the question of Frank Bettasso's credibility. See *Buehler v. Whalen* (1976), 41 Ill. App. 3d 446, 355 N.E.2d 99, *aff'd* (1978), 70 Ill. 2d 51.

As to the various asserted errors concerning final argument in this case, we have reviewed the argument and find that as to the improper statements, the court sustained the objections by the defense and the

court was in the best position to determine if the error required declaration of a mistrial. We find no error in failing to order a mistrial and no prejudice requiring reversal. On the overruled defense objections to plaintiffs' argument, we find no error. The objections sustained by the court to the argument of the defense were properly sustained. No purpose would be served in further lengthening this opinion to examine the specifics of each point raised. There was no reversible error with regard to the court's rulings on the final arguments in this case.

■■ The final battery of issues raised by the appellants focuses upon the instructions given by the court. The defense objected to the giving of plaintiffs' instruction No. 12, which was a modification of Illinois Pattern Jury Instruction, Civil, No. 200.04 (2d ed. 1971) (hereinafter IPI). We find that there was evidence in the record to support a finding of undue influence by specific conduct and to support a finding that Frank Bettasso, Sr., procured the preparation of the documents. As to the assertion that the instruction was confusing, we note it was an IPI instruction (Ill. Rev. Stat. 1977, ch. 110A, par. 239) and that we have specifically approved the giving of this instruction. (*Beyers v. Billingsley* (1977), 54 Ill. App. 3d 427, 369 N.E.2d 1320.) We find, also, that there was no error in giving plaintiffs' instruction No. 13, which was a modified version of IPI Civil No. 200.04 designed to fit the gift issues in the lawsuit. (*Cf. Powell v. Bechtel* (1930), 340 Ill. 330, 337, 172 N.E. 765; *Brown v. Commercial National Bank* (1969), 42 Ill. 2d 365, 247 N.E.2d 894.) It is not necessary, in order to prove undue influence invalidating a gift, that evidence be produced indicating that the fiduciary donee procured the gift. That requirement applies to wills, but not to deeds or gifts *inter vivos* or *causa mortis*. 340 Ill. 330, 337.

■■ As to the objections to instructions Nos. 14 and 16 of the plaintiffs, which were modifications of IPI Civil No. 200.05, there was no error. The substance of defense objection is that the instruction should have defined the mental capacity necessary to make a trust in terms of that required for a gift, and not as was done in terms of that required for a will. Here, as the defense concedes, the trust and the pour-over will were both testamentary dispositions, executed together on the same day and forming one dispositional scheme. Under the circumstances, the standard to be applied, as the instructions correctly stated, was that of the testamentary capacity to make a will.

■■ ■ We find no error with plaintiffs' instruction No. 24, which informed the jury that it could consider Hazel Ware's age and health, as they affected mental capacity, in determining the validity of the trust and gifts. We have already noted that the trust was, in actuality, a testamentary disposition, complementing the will. As to the gifts, any possible error with this instruction would have been harmless, given that

the jury's verdict was advisory only concerning them. The final argument by the defense on this appeal is that their tendered instruction defining "undue influence" was better than the IPI instruction, IPI Civil No. 200.09. There was no reversible error in the giving of the IPI instruction.

For the reasons noted, the judgment of the Circuit Court of Bureau County is affirmed.

Affirmed.

STENGEL and SCOTT, JJ., concur.