AETNA CASUALTY AND SURETY COMPANY OF ILLINOIS, Plaintiff-Appellant, v. JAMES J. BENES AND ASSOCIATES, INC., *et al.*, Defendants (Intergovernmental Risk Management Agency *et al.*, Defendants-Appellees).

Second District   No. 2—91—1073

Opinion filed May 28, 1992.

Michael R. Orlando, of Connelly, Mustes & Schroeder, of Chicago, for appellant.

Gerald J. Brooks, of James, Brooks, Adams & Tarulis, of Naperville, for appellee Village of Clarendon Hills.

Kenneth T. Garvey and Robert J. O'Connor, both of Bresnahan & Garvey, of Chicago, for appellee Intergovernmental Risk Management Agency.

JUSTICE McLAREN delivered the opinion of the court:

Aetna Casualty and Surety Company of Illinois, plaintiff, filed an action seeking a declaration that it is entitled to reimbursement from the Intergovernmental Risk Management Agency (IRMA), defendant, for one-half of the defense and settlement payments made by Aetna on behalf of the Village of Clarendon Hills in an underlying suit. The trial court denied Aetna's motion for summary judgment and granted IRMA's cross-motion for summary judgment. Judgment was entered in favor of defendants, and plaintiff appealed. For the following reasons, we affirm.

J. Congdon Sewer Service, Inc. (Congdon), a general contractor, entered into a contract with the Village of Clarendon Hills (the Village) to perform construction services on a sewer project known as the Traube Avenue Storm Drainage Relief Sewer and Street Improvements Project. The terms of the contract required Congdon to name the Village as an additional insured under its policy with its commercial general liability insurer, Aetna. Accordingly, Aetna issued an additional insured endorsement naming the Village as an additional insured under Congdon's general liability policy.

At all relevant times, the Village was a member of an organization known as the Intergovernmental Risk Management Agency

(IRMA). As a member, the Village paid a certain sum of its municipal funds to IRMA in consideration of IRMA's promise to provide risk management services to the Village, including the defense and settlement of claims.

On October 19, 1989, Manuel Valdovinos, an employee of Congdon, suffered fatal injuries while working on the sewer project. A lawsuit was filed in the Federal District Court for the Northern District of Illinois against the Village, among others, for damages sustained by the estate of Valdovinos (hereinafter the Valdovinos litigation). In its defense, the Village tendered the contract between Aetna and Congdon naming the Village as an additional insured. Accordingly, Aetna agreed to pay for the Village's defense, but reserved the right to participate in the Village's defense with IRMA on a *pro rata* basis. Thereafter, Aetna tendered the Village's defense to IRMA and requested that IRMA contribute on an equal basis with Aetna for defense and potential indemnification of the Village in the Valdovinos litigation. IRMA responded by stating:

"[T]here is no written policy of insurance issued to the Village of Clarendon Hills by IRMA for the accident that occurred on October 19, 1989, in the Village of Clarendon Hills involving J. Condgon [*sic*] Sewer Service, Inc. and Manuel Valdovinos.

Our review of the policy of insurance, naming the Village of Clarendon Hills as an additional insured, clearly indicates that your company, Aetna Life and Casualty, should be providing a defense and indemnification to the Village of Clarendon Hills."

Aetna has paid $1.4 million to settle the Valdovinos litigation thus far. The final amount Aetna will pay in the Valdovinos litigation, however, will be determined in a pending contribution action brought by the Village against James J. Benes & Associates, Inc., the engineers on the sewer project, also named as defendants in the underlying suit. This contribution action was originally filed by the Village in the Valdovinos litigation to recover the amount paid on behalf of the Village in excess of the Village's *pro rata* share pursuant to the Joint Tortfeasor Contribution Act (Ill. Rev. Stat. 1989, ch. 70, par. 301 *et seq.*). However, the contribution action was dismissed without prejudice in the Valdovinos litigation at the time Valdovinos released all defendants pursuant to the settlement. Accordingly, the Village refiled a contribution action against Benes which is currently pending in the circuit court of Du Page County.

On May 2, 1990, Aetna filed a complaint for declaratory judgment in the circuit court of Cook County. Count I presently exists as a counterclaim in a separate declaratory judgment action and is not rel-

evant to this controversy. Count II comes to this court pursuant to defendants' motion to transfer venue and is the only count that exists in the present declaratory judgment action. In count II, plaintiff sought a declaration that a contractual agreement between the Village and IRMA which allegedly obligated IRMA to defend and indemnify the Village for liability incurred in the Valdovinos litigation requires IRMA to reimburse Aetna for the amount of defense costs and settlement payments made by Aetna on behalf of the Village in the Valdovinos litigation in excess of its equal share. IRMA responded by denying that it owed any defense or indemnity obligation to the Village.

Thereafter, Aetna filed a motion for summary judgment pursuant to section 2—1005 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005) as to the relief sought in count II of Aetna's complaint for declaratory judgment. IRMA and the Village responded by filing a cross-motion for summary judgment on the same issues. After a hearing, the court entered an order denying Aetna's motion for summary judgment and granting summary judgment in favor of defendants. Aetna appealed.

The aim of summary judgment is not to try issues, but to determine whether any triable issues of fact exist. (*Choi v. Commonwealth Edison Co.* (1991), 217 Ill. App. 3d 952, 956.) Plaintiffs are not required to prove their case at the summary judgment stage, but must provide a factual basis which would arguably entitle them to judgment in their favor. (*Connor v. Merrill Lynch Realty, Inc.* (1991), 220 Ill. App. 3d 522, 528; *Choi*, 217 Ill. App. 3d at 956.) Summary judgment is a drastic remedy and should be granted only when the pleadings, depositions, and admissions on file, together with the affidavits presented, if any, show there is no genuine issue as to any material fact such that the movant's right to judgment is clear as a matter of law. (Ill. Rev. Stat. 1989, ch. 110, par. 2—1005(c); *Logan v. Old Enterprise Farms, Ltd.* (1990), 139 Ill. 2d 229, 233-34; *Sawko v. Dominion Plaza One Condominium Association No. 1-A* (1991), 218 Ill. App. 3d 521, 528.) The trial court must strictly construe all such evidence and draw reasonable inferences from the record in favor of the nonmoving party. The motion should be denied where reasonable persons could draw divergent inferences from the undisputed facts. *Loyola Academy v. S & S Roof Maintenance, Inc.* (1992), 146 Ill. 2d 263, 272.

On review, we must determine whether the trial court abused its discretion in concluding there were no genuine issues of material fact such that the judgment was correct as a matter of law. (*Schnering v. Midlothian Park District* (1991), 219 Ill. App. 3d 664, 666; *Sawko*,

218 Ill. App. 3d at 528.) In this case, the trial court failed to indicate its rationale in granting summary judgment, but, instead, adopted the arguments of defendants as the basis for its ruling. However, summary judgment may be affirmed on any grounds supported by the record, regardless of whether the trial court relied on those grounds or whether the trial court's reasoning was correct. See *Beckman v. Freeman United Coal Mining Co.* (1988), 123 Ill. 2d 281, 286.

The issue presented for review is whether there is a genuine issue of material fact concerning IRMA's obligation to contribute to the defense and settlement of the Valdovinos litigation. In support of its position, Aetna contends that IRMA's contract and bylaws specifically obligate IRMA to provide comprehensive liability coverage to the Village on the date of Valdovinos' fatal injury, which amounts to primary insurance coverage, concurrent with Aetna. Thus, Aetna asserts that IRMA is obligated by contract to reimburse Aetna for one-half of the settlement paid by Aetna on behalf of the Village in the Valdovinos litigation.

■ In insurance law, contribution is "an equitable principle arising among coinsurers which permits one who has paid the entire loss to receive reimbursement from the other insurer liable for the loss." (*Hall v. Country Casualty Insurance Co.* (1990), 204 Ill. App. 3d 765, 772; *Pekin Insurance Co. v. Cincinnati Insurance Co.* (1987), 157 Ill. App. 3d 404, 406.) The reason for this rule is that one insurer has paid a debt which is equally owed by the other insurers. The fact that one insurer undertakes the burden of a full settlement payment does not mean the insurer is a volunteer. Thus, the paying insurer is not precluded from recovering contribution from the other insurers liable for the same loss. (*Royal Globe Insurance Co. v. Aetna Insurance Co.* (1980), 82 Ill. App. 3d 1003, 1005.) In order for the settling insurer to recover in a contribution action, the policies must cover a risk on the same basis, and there must be identity between the policies as to parties and insurable interests and risks. *Home Indemnity Co. v. General Accident Insurance Co.* (1991), 213 Ill. App. 3d 319, 321; *United States Fidelity & Guaranty Co. v. Continental Casualty Co.* (1990), 198 Ill. App. 3d 950, 955.

Citing *Royal Globe Insurance Co. v. Aetna Insurance Co.* (1980), 82 Ill. App. 3d 1003, Aetna contends that it is entitled to contribution from IRMA for defense and settlement payments made on behalf of the Village in the Valdovinos litigation. In that case, Royal Globe issued a business liability policy to a realty company. In turn, Aetna issued a public and garage liability policy to its insured, a parking garage. Since the realty company was the managing agent of the

parking garage, the realty company was listed as an additional insured under the Aetna policy. During the policy periods of both insurance contracts, a third party brought a personal injury action against both companies for injuries suffered on the premises of the parking garage. When Aetna refused to undertake the defense and payment of the claim, Royal Globe settled on behalf of the realty company. Royal Globe demanded payment of one-half of the settlement from Aetna, and Aetna refused. Thus, Royal Globe sought a declaration that Aetna was liable in equitable contribution to make such payment. On appeal, the court held that Royal Globe's complaint sufficiently stated a cause of action for contribution from Aetna.

■ In the present case, Aetna claims that it is entitled to contribution from IRMA based on the factual similarities of *Royal Globe*. We note that Royal Globe involved an action for contribution between two commercial insurance carriers. The structure and policy of IRMA, however, do not support this characterization.

IRMA provides risk management services to the Village and approximately 48 other municipalities. Article XV of IRMA's bylaws defines the contractual relationship among the entities participating in IRMA as follows:

> "This document shall constitute a contract among those members of local government which become MEMBERS of the AGENCY. The obligations and responsibilities of the MEMBERS set forth herein *** shall remain a continuing obligation and responsibility of the MEMBER. The terms of this contract may be enforced in a court of law by the AGENCY for any of its MEMBERS."

Article I of the contract, in effect at the time of Valdovinos' injury, sets forth IRMA's purpose as follows:

> "The Intergovernmental Risk Management Agency is a cooperative agency voluntarily established by contracting units of local government as defined in the Illinois Constitution of 1970 *** for the purpose of seeking the prevention or lessening of casualty losses to municipal properties and injuries to persons or property which might result in claims being made against such units.
>
> It is the intent of the MEMBERS of the CONTINUING AGENCY to create an entity which will administer a joint risk management pool and utilize such funds contributed by the MEMBERS to defend and protect, in accordance with these By-laws, any MEMBER of the AGENCY against stated liability

or loss. Such By-laws shall constitute the substance of a contract among the MEMBERS.

All funds contained within the Risk Management Pool are funds directly derived from its MEMBERS which are local governments within the State of Illinois. It is the intent of the parties in entering into this agreement that, to the fullest extent possible, the scope of risk management undertaken by them through a joint municipal self-insurance program using governmental funds shall not waive, on behalf of any local public entity or public employees as defined in the Local Governmental and Governmental Employees Tort Immunity Act, any defenses or immunities therein provided."

The contract defines "joint risk management pool" as "[a] fund of public monies established by [IRMA] to jointly self-insure certain risks within an agreed scope and to purchase catastophe [*sic*], excess and aggregate stop loss insurance."

Further, the contract enumerates the powers and duties of the agency, one of which is "[t]o provide risk management services including the defense of and settlement of claims," which is defined as "[a] program attempting to reduce or limit casualty losses to municipal properties and injuries to persons or property caused by the operations of units of local government."

The types and amounts of coverage afforded to members of the agency are also set forth in the contract, which provides a $5 million limit per occurrence for general liability. However, IRMA's bylaws specifically allow *any member* to purchase any insurance coverage above those amounts purchased by the agency. It also specifically allows *the agency*, IRMA, to purchase excess and aggregate stop loss insurance from approved companies.

In *Antiporek v. Village of Hillside* (1986), 114 Ill. 2d 246, 251, our supreme court held that membership in IRMA substantively amounts to "pooled *self-insurance*, through formal agreement, of governmental entities which share the risks and costs of civil liabilities" (emphasis added) and does not operate as a waiver of the municipal tort immunities conferred by the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (Ill. Rev. Stat. 1985, ch. 85, par. 1—101 *et seq.*). The *Antiporek* court reached this conclusion after analyzing both the structure of the IRMA contract and bylaws and the public policy concerns behind the establishment of intergovernmental agreements for joint risk pooling, such as IRMA. Although the plaintiff in *Antiporek* attempted to analogize IRMA to an insurance company, the court summarized the essence of IRMA as follows:

"IRMA provides a totally different type of protection—*one tantamount to self-insurance* within the meaning of section 9—103 [of the Tort Immunity Act]. Participating public entities, too small to self-insure, pool their resources and risks to provide a level of protection from potential fiscal disasters which would otherwise accompany large, nonimmune liabilities. IRMA participants have not shifted the risk to for-profit risk takers, but have instead decided to share the risk among themselves. The contract and bylaws are distinguishable from commercial policies in that they require supplemental contributions from all members—even those which have submitted no claims—if liabilities outstrip annual contributions. A complementary provision reduces each participant's next succeeding annual contribution if claims against the pool are fewer than forecast. Funding IRMA in that manner underscores that the risks and costs of civil liability are completely internalized among its participants, *so every penny paid on every claim is taken from revenue otherwise available to meet the governmental responsibilities of member municipalities.* Finally, because there are no private investors or nongovernmental participants, there is no danger that private persons will receive an unconscionable profit by accepting premiums while asserting immunities to avoid claims." (Emphasis added.) *Antiporek*, 114 Ill. 2d at 250-51.

Aetna contends that *Antiporek* is inapplicable to the facts of this case because its ruling is restricted to the issue of a municipality's waiver of governmental immunity. Thus, Aetna urges this court to treat IRMA as an insurance company for purposes of equitable contribution because it functions in the same manner as a commercial insurance company by providing risk protection. It is true that *Antiporek* did not determine IRMA's status for all purposes and did not specifically analyze the liabilities of IRMA and commercial carriers in conjunction with one another. However, we deem its rationale and characterization of IRMA as a pool of self-insureds applicable to the facts of this case.

Since *Antiporek*, section 9—103 of the Tort Immunity Act has been amended to allow municipalities to acquire commercial liability insurance without waiving their immunities under the Act. Aetna attempts to characterize the legislature's act as rendering *Antiporek* moot. On the contrary, we construe the amendment to be an extension of *Antiporek*. In reaching its holding, the *Antiporek* court reasoned that immunity is waived when the municipality's liability is cov-

ered by private commercial carriers because there is no risk of tax revenues being diverted from public functions. The court further reasoned that "when a municipality self-insures, it bears all risks itself, and settlements or awards are paid directly from government coffers." (*Antiporek*, 114 Ill. 2d at 250.) Thus, *Antiporek* distinguished the purchase of insurance from separate licensed insurance companies from self-insurance and announced the public policy interest of protecting public funds and property and preventing the diversion of tax monies from their intended purpose of paying damage claims. (See *Ramos v. City of Countryside* (1985), 137 Ill. App. 3d 1028, 1034.) Under the amendment, municipalities have the choice of electing either to rely on self-insurance or have a contractor name the municipality as an additional insured under its policy with a commercial carrier as a bargained-for-benefit from contracting for specific projects. In either case, the municipalities' immunities are protected.

■ Thus, IRMA is not and ought not to be treated as a private insurance carrier. The reason a self-insured municipality would acquire commercial liability insurance for a specific project, even though it is part of a self-insurance pool, such as IRMA, is because it chooses not to place taxpayer revenues in jeopardy. Allowing Aetna's equitable contribution claim would completely undercut the rationale of *Antiporek*. In finding "[t]he substance of IRMA [was] pooled self-insurance" (*Antiporek*, 114 Ill. 2d at 251), the court reasoned that treating IRMA as an insurance policy would unfairly penalize municipalities too small to self-insure, because larger municipalities capable of self-insuring could retain their immunities under the Act. To hold that the IRMA agreement is an insurance policy for purposes of equitable contribution from a commercial carrier would penalize small municipalities for the exact reason the *Antiporek* court ruled otherwise.

For example, if a large municipality capable of self-insuring would have been named as the insured party under Aetna's policy in this case, Aetna would be claiming a right of equitable contribution against its own insured. This would amount to a demand that the money paid out on behalf of the named insured be reimbursed by the insured, which is completely contrary to the purposes of insurance.

The sole authority Aetna cites in opposition to *Antiporek* is *Wesala v. City of Virginia* (Minn. App. 1986), 390 N.W.2d 285, *vacated & appeal dismissed* (Minn. 1987), 401 N.W.2d 73. The *Wesala* court addressed the issue of whether a municipality's membership in the League of Minnesota Cities Insurance Trust (LMCIT), similar to IRMA, resulted in a waiver of a Minnesota tort immunity statute. The court found that LMCIT operated in the same manner as a commer-

cial insurer and was an effective device to spread risk because the member municipalities did not bear the entire risk individually. As a result, the court found that the city waived its immunity by its membership in LMCIT. While this case is instructive on the position of another jurisdiction, we are bound to follow *Antiporek* and the sound policy it articulates. See *Kannel v. State Farm Mutual Automobile Insurance Co.* (1991), 222 Ill. App. 3d 1013, 1018.

Under *Antiporek*, IRMA is not an insurance company, but a pool of self-insured municipalities. Thus, we find no identity between the IRMA contract and Aetna's policy naming the Village as an additional insured concerning the parties, insurable interests, and risks. Accordingly, Aetna has no right of equitable contribution from IRMA pursuant to the Valdovinos' settlement. For the foregoing reasons, we find that the trial court did not abuse its discretion in granting summary judgment in favor of defendants, as the pleadings and evidence before the court show there is no genuine issue of material fact and that defendants' right to judgment is clear as a matter of law.

Accordingly, the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

UNVERZAGT and DOYLE, JJ., concur.