**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220004-U

Order filed April 3, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| In re ESTATE OF ETHEL M. PRYOR, Deceased | ) ) ) ) ) ) ) ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, <br><br> Appeal No. 3-22-0004 Circuit No. 13-P-54 <br><br> Honorable |
| (Kathy Ralph, Petitioner-Appellant, v. Michael Pryor, Respondent-Appellee). | ) ) | David Brown, Judge, Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices McDade and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*:   Section 4-4 of the Probate Act does not require republication of a will each time a trust referenced therein is amended. However, summary judgment was improper where genuine issues of material fact remained concerning whether the decedent was under undue influence and/or lacked testamentary capacity when the amendments to the trust were executed. Affirmed in part; reversed in part and remanded.

¶ 2 Petitioner, Kathy Ralph (Ralph), moved for summary judgment on her declaratory judgment action,[1] arguing that the second of four competing estate plans executed by the decedent, Ethel Marie Pryor, controlled, because it was the only plan that involved a contemporaneous execution of the will and the trust referenced therein. Respondent, Michael Pryor, urged that section 4-4 of the Probate Act of 1975 (755 ILCS 5/4-4 (West 2008)) does not require republication of a will each time a trust referenced therein is amended and, rather, expressly allows for wills to bequeath estate assets to a trust, even if that trust is amended after the execution of the will. In addition, Michael filed a cross-motion for summary judgment, arguing that the third estate plan, as the more recent plan, controlled over the second, and that the fourth estate plan was invalid due to Ethel's lack of testamentary capacity at the time of its execution. Ralph responded, in part, that Ethel acted under Michael's undue influence in executing the third estate plan and did not lack testamentary capacity in executing the fourth estate plan. The trial court denied Ralph's motion for summary judgment and granted Michael's cross-motion for summary judgment. Ralph appeals both rulings. We affirm the denial of Ralph's motion for summary judgment based on our interpretation of section 4-4, and we reverse the granting of Michael's cross-motion for summary judgment based on our determination that questions of fact remain concerning undue influence and testamentary capacity.

¶ 3 I. BACKGROUND

---

[1] Ralph's motion did not specify the cause of action underlying her motion for summary judgment. However, following the 2017 appeal, her declaratory judgment action remained pending, and the parties clearly seek to have the court resolve which of four competing estate plans control.

¶ 4    Ethel Pryor, who never married or had children of her own, passed away at age 86 on September 3, 2012. Six months later, the trial court appointed Michael, who was Ethel's nephew, to be the legal representative of her estate. The estate, partially distributed, remains pending in probate court. The estate's primary asset is 7872 shares of Caterpillar stock, valued between $78 and $210 per share during the relevant period. The will bequeathed the residue of the estate, including the Caterpillar stock, to the trust.

¶ 5    We have recounted key portions of the estate's procedural history in our earlier order, *In re Estate of Pryor*, 2017 IL App (3d) 170023-U. Briefly, in February 2015, Ralph, who was Ethel's great niece, filed a declaratory judgment action seeking to determine which of Ethel's four estate plans controlled. *Id.* ¶ 4. In December 2015, Ralph moved to appoint a special administrator of the estate, arguing in part that Michael—who was the trustee and, together with his son (Todd Pryor), the primary beneficiary under the third estate plan—should not be permitted to play a role in choosing which estate plan controlled. *Id.* ¶ 19. The trial court denied Ralph's motion, citing to *Estate of Hawley*, 183 Ill. App. 3d 107, 109 (1989), which allows for some conflict of interest when the conflict is expressly contemplated by the estate documents. See *Pryor*, 2017 IL App (3d) 170023, ¶ 21.

¶ 6    This court's majority affirmed the denial of Ralph's motion, but on different grounds. *Id.* ¶ 12. The majority determined that Ralph had not cited the proper statutory section to obtain the relief sought. *Id.* The dissent disagreed, explaining that an oral exchange during the trial court proceedings had corrected that problem. *Id.* ¶¶ 19-20. The dissent addressed the merits of Ralph's conflict-of-interest argument and agreed with her. *Id.* ¶ 24. The dissent recognized the importance of protecting a testator's right to appoint executors and trustees of her own choosing, even if there is a conflict of interest. *Id.* ¶ 25. Still, the dissent continued, this right must be balanced against

3

the rights of the trust beneficiaries to be able to demand that the trustee adhere to his fiduciary duty. *Id.* In the dissent's view, "the facts and circumstances surrounding the trust create a potential for a conflict of interest that is not permissible because of the potential adverse effect on the interests of the other beneficiaries if Michael were to participate in any way in the determination of which trust amendment is the appropriate instrument to employ and to determine the distribution of the shares of the estate." *Id.* ¶ 24. The dissent would have reversed and remanded the cause for the appointment of a special representative to replace Michael. *Id.* ¶ 25.

¶ 7 Following this court's order, Ralph's declaratory judgment action remained pending. Despite the majority's disposition, the parties ultimately agreed that a special administrator should be appointed in helping to determine which of the four estate plans controlled.

¶ 8 The four estate plans were as follows: (1) the 2005 Rochford Estate Plan, which included the original revocable living trust, with no corresponding will, dated June 3, 2005, drafted by the Jim Rochford law firm, with Ethel as the trustee, her close friend, Deloris Nieukirk, as successor trustee, and Charles Dudley as a second successor trustee; (2) the 2009 Rochford Estate Plan, which included the first amendment to the revocable living trust, with corresponding will, dated February 13, 2009, drafted by the Rochford law firm, with Ethel as a trustee and Imogene Secretan and Jim Rochford as co-successor trustees; (3) the 2012 Harrod Estate Plan, which included the second amendment to the revocable living trust, without republication of the will, dated July 12, 2012, drafted by the (Daniel) Harrod law firm, with Ethel as the trustee, Michael as successor trustee, and Michael's son Todd as the second successor trustee; and (4) the 2012 Rochford Estate Plan, which included the third amendment to the revocable living trust, without republication of the will, dated August 13, 2012, drafted by the Rochford law firm, with Ethel as the trustee, Michael as the successor trustee, and Rochford as the second successor trustee.

¶ 9    The intended distribution of each estate plan was as follows. The 2005 Rochford Plan included only a revocable trust, not a will. After nominal bequests to friends and the church, the trust evenly distributed the residue of the estate to the members of Ethel's original family of birth— her four brothers (or their families, if the brother predeceased her)[2], plus her close friend Nieukirk. Each group would receive a 1/5 share.

¶ 10    The 2009 Rochford Estate Plan included a 2009 will and a 2009 amended trust. The will contained an *in terrorem* provision that, in certain circumstances, prohibited interested parties from challenging it. It named Nieukirk and, next, Dudley as executors (the pair had previously been named successor trustees in the 2005 trust). It bequeathed the residue of the estate to the trust and provided that the bequeathed property would be distributed according to the terms of the trust, *including any amendment to the trust made before Ethel's death*. After certain nominal bequests, the trust again evenly distributed the residue of the estate to Ethel's four brothers (or their families, if the brother predeceased her), plus Nieukirk. Again, each group would receive a 1/5 share.

¶ 11    The 2012 Harrod Estate Plan departed from the two prior estate plans. There was no republication of the will. Instead, there was only the 2012 Harrod Amendment to the trust. The amended trust directed that the residue of the estate was to be split as follows: (1) Michael was to receive a 1/3 share, (2) Michael's son, Todd Pryor, was to receive a 1/3 share, and (3) Nolan Pryor, Jr. and Allen Pryor, the sons of Ethel's brother Nolan, were to split the final 1/3 share. Nieukirk, as well as the children of two of Ethel's brothers and certain great nieces and nephews whose

---

[2]Ethel had a fifth brother who passed away in 1958, never married, and had no children. He is not accounted for in any of the estate plans.

5

parents had passed, were excluded except for nominal bequests in the $1000 to $2000 range (with Ralph receiving a bequest of $10,000).

¶ 12     The 2012 Rochford Estate Plan represented a partial return to the original estate plan. Again, there was no republication of the will. Instead, there was only the 2012 Rochford Amendment to the trust. The amended trust directed that the residue of the estate was to be split as follows: (1) Michael was to receive a 1/3 share, and (2) the remaining 2/3 share was to be split in 1/4 shares for the families of each of Ethel's four brothers. Michael was, therefore, in line to inherit both in his own right and, depending on the timing of his father's death, as a child of Ethel's brother. However, the children of two of Ethel's brothers and certain great nieces and nephews whose parents had passed were no longer excluded. Nieukirk was to receive $1000.

¶ 13                              A. Motions for Summary Judgment

¶ 14     On May 14, 2021, Ralph moved for summary judgment on her declaratory judgment action. She urged that the 2009 Rochford Estate Plan controlled, because it was the only plan that complied with section 4-4 of the Probate Act, which in her view, required contemporaneous publication or republication of the will each time a trust referenced therein was amended. Ralph also argued that Michael exerted undue influence in procuring the 2012 Harrod Estate Plan. As she would later clarify at hearing, this question should preclude the court from granting summary judgment in Michael's favor.

¶ 15     On October 29, 2021, Michael filed the operative cross-motion for summary judgment. He argued that the will's *in terrorem* provision operated to disinherit those, such as Ralph, who challenge the will. In the alternative, he argued in favor of the 2012 Harrod Estate Plan. According to Michael, the 2012 Harrod Plan, being the more recent plan, controlled over the 2009 Rochford

6

Estate Plan and, further, the 2012 Rochford Estate plan, although the most recent plan, was invalid due to Ethel's lack of testamentary capacity at the time of execution.

¶ 16        The parties attached various documents to their pleadings and responsive pleadings. Ralph attached, *inter alia*, attorney Rochford's deposition transcripts. Michael attached, *inter alia*, the affidavits of Michael (himself), Sandy Pryor (Michael's wife), and Barbara E. Daraban (Harrod's legal secretary). The parties also referred to nursing home notes in the months preceding Ethel's death.

¶ 17        Attorney Rochford testified in deposition that Ethel was referred to him by a mutual contact in the Kiwanis organization. Rochford testified to the estate plans drafted by his office. Rochford and his co-counsel, Cynthia Volk, helped Ethel to craft the 2005 and 2009 estate plans. Volk took the lead on drafting Ethel's estate plan when, in 2009, Ethel named Rochford as a successor trustee. Through 2012, Rochford remained in contact with Ethel and he and his wife (and paralegal), Deb Rochford, visited her in the nursing home in April and May of 2012. Ethel informed them that Michael had played a more active role in her life as of late, whereas she had not seen several of her other intended beneficiaries in a while. Ethel informed Rochford that she wanted to leave a larger share of her estate to Michael, who Rochford also knew to be her power of attorney. Rochford believed that Ethel had the testamentary capacity to so provide. Rochford believed this even while acknowledging certain 2011 statements that Ethel had made against Michael's father and, to a lesser degree, Michael (addressed below). Rochford's firm drafted the 2012 Rochford Estate Plan consistent with his 2012 discussions with Ethel. However, Volk, not he, was present at the execution of the documents. Although Rochford was not present, he clarified that it was his firm's practice to ask elderly clients questions aimed at discerning their testamentary capacity prior to signing and he had no reason to believe that Volk did not follow that practice.

¶ 18      Rochford also testified in deposition to the issue of Michael's undue influence. In July 2011, Rochford's firm's secretary wrote the following note to Rochford based on her phone conversation with Ethel: "Her nephew's wife threatening her to be her POA or else—remove her from will. She's very upset. Can you help?" Attached to that note was a post-it instructing "C.V. [Cynthia Volk], please call her[.]" Rochford further acknowledged that, in 2011, Ethel informed his law firm that she was "upset," that Kenneth (Michael's father) and Michael were going to take over her finances. Also, a firm document written in Volk's handwriting provided: "Kenny and his son, on more than one occasion, told her to leave all of her assets to him and his son." The date of that document is unclear from Rochford's deposition testimony.

¶ 19      In contrast, Michael averred in an affidavit that he had a special relationship with Ethel, and, according to his parents, he was "the closest to her." Michael's son, Todd, also enjoyed a special relationship with Ethel. When Todd was a young man, he suffered a life-threatening head injury and Ethel's visits and support made a difference to his recovery.

¶ 20      Michael recounted that Ethel was hospitalized in February 2012 and, in April 2012, she moved into a nursing home. While there, Michael and his wife continued their near-daily visits, running errands for Ethel: "She always wanted greeting cards to send to her many friends and nieces and nephews." In April 2012, Ethel was offered, but refused, kidney dialysis treatment. She understood the consequences of her decision, explaining that she had lived a good life.

¶ 21      Michael further averred that, once in the nursing home, Ethel told Sandy and him that she wanted to change her will. Michael asked Ethel if he should contact Rochford, but Ethel responded, "No, I don't trust that Rochford character." In late April, Michael took Ethel to see attorney Harrod. In late June or early July 2012, Michael again took Ethel to see Harrod. Ethel spoke with Harrod while Michael remained in the waiting room. On July 11, 2012, Michael took

Ethel to see Harrod for a third time to execute the 2012 Harrod Estate Plan. The appointment lasted 30 minutes. Michael remained in the waiting room.

¶ 22    According to Michael, on July 11, 2012, Ethel was well-dressed. She engaged in lively conversation with him and with Harrod's secretary, Barbara Daraban. "[Ethel] exhibited no signs of any diminished mental capacity. She was clearly of sound mind on that day under no und[ue] influence, under no coercion."

¶ 23    Also according to Michael, in late July or early August 2012, Ethel began showing signs of diminished mental capacity upon taking Ativan (an anti-anxiety medication). Michael averred: "[b]efore [Ethel] began taking Ativan, she was alert, well oriented and was making her own decisions including medical decisions. *** Once she began taking Ativan *** she deteriorated rather quickly. Her mental capacity became greatly diminished in August of 2012." Also: "[I]n August 2012, the nurse at [the nursing home] asked if I would make decisions for [Ethel] because she became very mixed up and did not seem to have a grasp of things around her." Finally: "My wife Sandy and I visited [Ethel] on almost a daily basis from August through the time of her death in September. In August 2012, she clearly suffered from memory loss, weakness, and drowsiness. *** [S]he had a very poor understanding of *** her medical situation and with everything in general."

¶ 24    Sandy's affidavit was consistent with Michael's. In addition, Sandy averred that she was a registered nurse and, *inter alia*: "On August 3, 2012, [Ethel] began taking Ativan. Before that time, Ethel was alert, made sense while talking to her and was able to make her own medical decisions. However, on some of the last few days of July 2012, we noticed some issues with her, she was confused at times, she wanted to go back to her apartment and she was complaining of being tired all of the time." Also, in "August 2012," it was obvious to me that [Ethel's] mental

9

and physical condition was deteriorating at a concerning rate"; and "[Ethel] began suffering from confusion, memory loss, drowsiness, dizziness, and weakness with the medication of Ativan."

¶ 25    Daraban, Harrod's legal secretary, attested to her interactions with Ethel.  Daraban had occasion to observe Ethel in late April 2012.  Ethel was brought to the office by Michael, and "she clearly adored [him], as he did her."  Ethel was well-dressed, had excellent manners, and easily engaged in conversation.  They discussed how nice she looked and the beautiful sunny day.  Daraban's impression was the same when Ethel came into the office a second and a third time.  Ethel also engaged in conversation with the two witnesses to the amendment, Susan Karpraun (an office worker) and Don Pioletti (another client who was awaiting his meeting with Harrod).  Daraban makes it a point to speak with the person whose documents she is notarizing or signing and, more than once in 18 years as a legal secretary, she witnessed clients that she did not believe had the mental capacity to understand the documents that they were signing.  This was not one of those times.  Rather, Daraban felt that Ethel was "in her right mind to make any changes she felt appropriate at the time."  Further, "I found [Ethel] to be of sound mind and not under or subject to duress, fraud or undue influence[.]"

¶ 26    The parties also referred to the nursing home notes.  On June 11, 2012, one month prior to the Harrod Amendment, the notes state that "resident is 86 years old and confused."  On July 11, 2012, the date of the Harrod Amendment, the notes state that "[r]es[ident] up with minimal assist.  Alert and oriented."  On August 27, 2012, two weeks after the Rochford Amendment, the notes state that "[r]esident [is] in room for evening meal due to increased confusion and complaint of feeling sick to stomach and increased cough."  On August 28, 2012, the notes state that "[r]esident seems confused not understanding things she says.  Will continue to monitor."

¶ 27    At the hearing on the summary judgment motions, the trial court and the parties clarified certain arguments. Relevant here, the court acknowledged that Michael had not presented a traditional cross-motion for summary judgment in the sense that he did not seek judgment on the same ground as Ralph. (Ralph sought judgment based on section 4-4 and Michael sought judgment based on the will's *in terrorem* provision and the question of Ethel's competence.)

¶ 28    Also relevant here, Ralph urged the trial court to distinguish between competence (or testamentary capacity) and undue influence:

> "Mr. Harrod made the charge against me that I alleged that [Ethel] was incompetent. I never did, ever, say anything like that.

> What I did say was there were legitimate legal arguments that should be investigated. Undue influence of someone who is a power of attorney has a conflict of interest; when he procures the document, the burden shifts to them to show us a valid document. I don't think they've done that.

> Especially, when they take the basic estate plan of the decedent and absolutely destroy it and just take it so that one-third goes to [Michael], one-third to his son, and the other third to two nephews in Iowa, and ten other people get nothing out of the [trust]."

¶ 29    Ralph also addressed Ethel's testamentary capacity on August 13, 2012. Ralph argued that, even if the affidavits were uncontroverted that Ethel was competent in July 2012, "[h]ow did they know she's not competent [four weeks later in August 2012]?" Also: "[T]here's no statement by anyone of the competency of [Ethel] on the date she signed the Rochford Amendment, so I don't know that the court can assume that she was competent or incompetent."

¶ 30    The trial court recounted that this had been an interesting case. It referenced prior attempts at settlement that had not come to fruition. It also stated that, should it determine that an estate

11

plan other than the 2012 Harrod Estate Plan—under which Michael had already distributed major assets—should control, the special administrator would be tasked with correcting for improper distributions. The special administrator, who was present at the hearing, did not say it could not be done.

¶ 31                               B. The Trial Court's Order

¶ 32        On December 3, 2021, the trial court issued a written order. Preliminarily, it rejected Michael's argument that the will's *in terrorem* clause precluded Ralph from seeking clarification on which estate plan controlled.

¶ 33        The trial court next rejected Ralph's argument that the 2009 Rochford Estate Plan controlled as being the only plan that complied with section 4-4 of the Act:

> "For the reasons more fully explained and stated on the record in open court ***, the court finds that [section 4-4 of the Act] does not require the republication (or other act) of a pour-over will every time a revocable living trust, which is referenced in the will, is amended. As a result, the court declines [Ralph's] request that the court invalidate the [2012 Harrod Estate Plan] and the [2012 Rochford Estate Plan] based upon that theory."

The court had explained in open court: "[Section 4-4] contemplates a testator making changes to the trust. It doesn't prohibit it. And there's nothing in there that says if they make a change to the trust that they have to republish a will or the like."

¶ 34        Returning to the written order, the trial court agreed with Michael's argument that the 2012 Harrod Estate Plan, being more recent, controlled over the 2009 Rochford Estate Plan. It determined that Ethel was "competent" when executing the 2012 Harrod Estate Plan:

> "[T]here are no material issues of fact relating to the execution of 'Harrod Amendment' with regard to [Ethel's] mental competency. The court finds that the affidavits [and/or

12

depositions of Michael, Ralph, Daraban, and Rochford] adequately support the conclusion that [Ethel] was competent at the time she signed the Harrod amendment."

The court did not address Ralph's argument that Ethel had acted under Michael's undue influence in executing the 2012 Harrod Estate Plan.

¶ 35 Further, the trial court agreed with Michael's argument that the 2012 Rochford Estate Plan, although the most recent, was invalid because Ethel was incompetent when executing it:

"The only admissible evidence regarding [Ethel's] [competency] at the time of the execution of the Rochford Amendment are the affidavits of [Michael and Sandy Pryor]. (The affidavit of Barbara Daraban only relates to the signing of the Harrod Amendment.) Those affidavits call into question [Ethel's] competency at or about the time of the execution of the Rochford Amendment. No other evidence was submitted in that regard. The court has reviewed thoroughly the transcript of Mr. Rochford's [deposition]. Mr. Rochford was not present at the signing of the Rochford Amendment and therefore had no personal knowledge of [Ethel's] mental condition or state at that time. He did testify he met with [Ethel] earlier (prior to the signing of the Harrod Amendment). As such, his deposition does not contradict [Michael and Sandy's] affidavits. Furthermore, no party has taken the position that the Rochford Amendment is valid and/or enforceable. As such, the court finds there are no material issues of fact regarding the Rochford Amendment and as a matter of law it is not valid or enforceable."

¶ 36 The trial court concluded: "As a result of the rulings on the [motions for summary judgment], the court hereby directs the Special Administrator to administer the probate estate consistent with the court's rulings and in compliance with the estate plan *** as set forth in the 2009 pour-over will and the [2012] Harrod Amendment to the revocable living trust." Thus,

13

although it did not expressly state, the trial court denied Ralph's motion for summary judgment and granted Michael's cross-motion for summary judgment. Ralph now appeals those rulings. Michael does not challenge the trial court's determination that the will's *in terrorem* clause does not prohibit Ralph from seeking a determination of the appropriate estate plan.

¶ 37                                   II. ANALYSIS

¶ 38        Ralph appeals the trial court's summary judgment rulings. A trial court may grant a motion for summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2020). When appropriate, summary judgment procedure is encouraged as an aid to expeditiously resolve a given lawsuit. *In re Estate of Hoover*, 155 Ill. 2d 402, 410 (1993). Nevertheless, summary judgment is a drastic remedy that should be granted only if the movant's right is clear and free from doubt. *Id*. As such, in determining whether the moving party is entitled to summary judgment, the court must construe the pleadings, depositions, exhibits, admissions, and affidavits on file strictly against the movant and liberally in favor of the opponent. *Id*. at 410-11. A genuine issue of fact exists if there is a dispute as to material facts or if reasonable persons may draw different inferences from undisputed facts. *Id.* at 411. A motion for summary judgment is not to decide questions of fact, but to determine whether one exists. *Aetna Casualty & Surety v. James J. Benes & Associates*, 229 Ill. App. 3d 413, 416 (1992). As such, motions for summary judgment present questions of law, which we review *de novo*. *Direct Auto Insurance Co. v. Beltran*, 2013 IL App (1st) 121128, ¶ 43.

¶ 39                  A. Ralph's Motion for Summary Judgment: Section 4-4

14

¶ 40    We first address whether the trial court properly denied Ralph's motion for summary judgment based on its interpretation of section 4-4 of the Probate Act. When interpreting a statute, the primary objective is to ascertain and give effect to the intent of the legislature. *In re Estate of Lieberman*, 391 Ill. App. 3d 882, 887 (2009). The best indicator of legislative intent is the language of the statute. *Id.* When the statutory language is clear and unambiguous, the language will be given effect as written, without resort to other principles of statutory interpretation. *In re Estate of Martin*, 2020 IL App (2d) 190140, ¶ 58. We may not depart from the plain language of the statute "by reading into it exceptions, limitations, or conditions not expressed by the legislature." *In re Estate of Ellis*, 236 Ill. 2d 45, 51 (2009). Like motions for summary judgment, statutory interpretation presents a question of law, which we review *de novo*. *Lieberman*, 391 Ill. App. 3d at 886.

¶ 41    Section 4-4 provides:

> "Testamentary additions to trusts. By a will signed and attested as provided in this Act *a testator may bequeath or appoint real and personal estate to a trustee of a trust* evidenced by an instrument, including the will of another who predeceases the testator, which is in existence when the testator's will is made and which is identified in the testator's will, *even though the trust is subject to amendment, modification, revocation or termination.* Unless the testator's will provides otherwise, *the estate so bequeathed or appointed shall be governed by the terms and provisions of the instrument creating the trust, including any amendments or modifications in writing made at any time before or after the execution of the testator's will* and before, or after if the testator's will so directs, the death of the testator. ***." (Emphases added.) 755 ILCS 5/4-4 (West 2008).

¶ 42    The parties dispute whether section 4-4 requires republication of a will each time a revocable living trust, which is referenced in the will, is amended.  If, as Ralph argues, section 4-4 requires republication, then only the 2009 Rochford Estate Plan is in compliance and we may end our analysis.  If, as Michael argues, section 4-4 does not require republication, then the 2009 Rochford Estate Plan, the 2012 Harrod Estate Plan, and the 2012 Rochford Estate Plan are all in compliance and we must proceed to address the questions of undue influence and testamentary capacity.

¶ 43    We determine that the plain language of section 4-4 resolves the dispute.  Section 4-4 plainly provides that the terms of the trust, including any amendments thereto, will govern the distribution of the bequeathed estate assets, even if the amendments to the terms of the trust were made after the will was made.  Moreover, as the trial court stated, section 4-4 contains no requirement that the will be republished or amended contemporaneous to each amendment to the trust.  See, *e.g.*, *Ellis*, 236 Ill. 2d at 51 (we will not read additional requirements into a statute).

¶ 44    Indeed, as our case law has discussed, the legislature drafted section 4-4 precisely to avoid such a requirement.  In *In re Estate of Meskimen*, 39 Ill. 2d 415, 418 (1968), our supreme court determined that a will's language manifested an intent to give the residue of the estate to the trustee to be administered as part of the trust.  In so concluding, the court referenced section 43a of the Probate Act (Ill. Rev. Stat. 1965, chap. 3, par. 43a) [now section 4-4]. *Id*. at 420.  The court noted: "The main purpose of this section was to validate transfers to [i]nter vivos trusts which were amenable or subject to modification, revocation, or termination, since there was a conflict in authority in other jurisdictions as to whether such bequests could be upheld if the trust had been amended or was even subject to an amendment." *Id*.  Thus, "it has been generally assumed" that the legislature enacted section 43a, now section 4-4, to clarify that a will's bequest to a trustee

16

remains valid even if the trust was later amended. *Id*. at 421; see also *In re Estate of Phelan*, 375 Ill. App. 3d 875, 887 n.1 (2007).

¶ 45 We would further note that here, Ethel's will itself contemplated that the bequeathed estate assets would be governed by a trust that was subject to amendment. *Supra* ¶ 10. Because we agree with the trial court's interpretation of section 4-4, we affirm its denial of Ralph's motion for summary judgment.

¶ 46 B. Michael's Motion for Summary Judgment:

Questions of Undue Influence and Testamentary Capacity

¶ 47 Turning to Michael's motion for summary judgment, we consider the separate questions of undue influence and lack of testamentary capacity. The question of undue influence arises as to the 2012 Harrod Estate Plan, because Michael, who stood in a fiduciary position, benefited from a plan which he helped to procure. The question of testamentary capacity arises as to the 2012 Rochford Estate Plan, because Michael alleged in his motion for summary judgment with some supporting evidence that Ethel lacked testamentary capacity when she executed that plan. We address each question in turn.

¶ 48 1. The Question of Undue Influence and the 2012 Harrod Estate Plan

¶ 49 We consider the question of Michael's undue influence over Ethel in the execution of the July 11, 2012, Harrod Estate Plan. A presumption of undue influence arises when a person who stands in a fiduciary relationship to the testator/decedent participated in the preparation or procurement of the estate plan and receives a substantial benefit under its terms. *In re Estate of Burren*, 2013 IL App (1st) 120996, ¶ 20. Kindness and affection, real or feigned, are ordinarily insufficient to create the presumption of undue influence. *Kelley v. First State Bank of Princeton*, 81 Ill. App. 3d 402 (1980). Rather, the testator's free will must be overcome such that she is

17

induced to do what she would not have done had she been left to act freely. *DeHart v. DeHart*, 2013 IL 114137, ¶ 27. To invalidate an estate plan, the undue influence must be directly connected with the execution of the instrument and operate at the time it is made. *Peters v. Catt*, 15 Ill. 2d 255, 263 (1958). Other factors that may support a finding of undue influence include old age and infirmity (*id.*) and a change in a long-established testamentary scheme (*Kelley*, 81 Ill. App. 3d at 417).

¶ 50        Here, there is evidence to support each of the three elements composing the presumption of undue influence. First, it is undisputed that Michael stood in a fiduciary position to Ethel. He was her financial power of attorney. See *DeHart*, 2013 IL 114137, ¶ 31 (a power of attorney is a fiduciary relationship). In addition, he stood in a position of trust and influence as her nephew, visiting her at the nursing home nearly every day. Second, Michael participated in the procurement of the 2012 Harrod Estate Plan. Michael contacted the Harrod law firm, even though Ethel was then working with the Rochford law firm (with Jim Rochford, Deb Rochford, and Cynthia Volk each visiting Ethel in the nursing home during the same time). Michael transported Ethel to and from the Harrod law firm to change her estate plan. Third, Michael received a substantial benefit from the new estate plan. Under the previous plan, Michael would most likely receive a 1/10 share of the estate (if Michael's father predeceased Ethel, a 1/5 share would be split between Michael and the family of his deceased sibling) and his son, Todd, would receive nothing. Under the 2012 Harrod Estate plan, Michael was to receive an immediate 1/3 share (regardless of whether his father passed) and his son, Todd, was to receive a 1/3 share.

¶ 51        There is also evidence of other factors suggesting undue influence—old age and infirmity and a change in a long-established testamentary scheme. *Catt*, 15 Ill. 2d at 265; *Kelley*, 81 Ill. App. 3d at 417. As to old age and infirmity, Michael does not dispute that, in the spring of 2012,

18

Ethel was taken to the hospital and, soon after, a nursing home. In the months that followed and until her death in September 2012, she would experience renal failure and intermittent confusion.

¶ 52    As to a change in a long-established testamentary scheme, not only were Michael and his son to benefit greatly under the new plan, but the descendants of some of Ethel's brothers, as well as Ethel's good friend, Nieukirk, were excluded except for nominal bequests. The 2012 Harrod Estate Plan upended the testamentary plan that Ethel had maintained for the previous seven years to bequeath equal shares to the families of each of her four brothers. We acknowledge that, in 2012, Rochford believed that Ethel in fact wanted Michael to have a larger share of the estate (despite his firm's 2011 concerns about Michael pressuring Ethel). Still, the 2012 Rochford Estate Plan, which we address in the next section, represents a swift return to the long-established plan to include the descendants of each of her brothers and, critical to this section of our analysis, is evidence from which a trier of fact could infer that Ethel was dissatisfied with, and never freely subscribed to, the 2012 Harrod Estate Plan that had excluded them.

¶ 53    All of this evidence, at a minimum, creates a question of fact as to undue influence at the time of the execution of the 2012 Harrod Estate Plan, precluding summary judgment in Michael's favor that the 2012 Harrod Estate Plan controls as a matter of law.

¶ 54    Michael does not respond to Ralph's undue influence argument. Like the trial court, Michael treats undue influence as synonymous with competence. In that regard, Michael argues in conclusory fashion that his, Sandy's, and Daraban's affidavits remain uncontradicted. However, undue influence may exist despite evidence of the testator's mental competence. *Hoover*, 155 Ill. 2d at 419. Michael's supporting affidavits on the issue of undue influence are either conclusory (Baraban's statement) or are not dispositive. They provide, for example, that Michael has always enjoyed a special relationship with Ethel and was her favorite, and that Ethel told Michael that she

19

did not trust attorney Rochford. These assertions appear to challenge the presumptions against Michael that arise from his receipt of a disproportionate share of the estate and his procurement of Harrod's law services. However, the assertions fall far short of establishing that the 2012 Harrod Estate Plan controls as a matter of law.

¶ 55      2. The Question of Testamentary Capacity and the 2012 Rochford Estate Plan

¶ 56      We next address the question of Ethel's competence, or testamentary capacity, at the time she executed the August 13, 2012, Rochford Estate Plan. "The standard test of testamentary capacity, *i.e.*, soundness of mind and memory, is that 'the testator must be capable of knowing what his property is, who are the natural objects of his bounty, and also be able to understand the nature, consequence, and effect of the act of executing [an estate plan].' " *DeHart*, 2013 IL 114137, ¶ 20 (quoting *Dowie v. Sutton*, 227 Ill. 183, 196 (1907)). "The law presumes that all individuals possess testamentary capacity until the contrary is proved." *In re Fordyce's Estate*, 130 Ill. App. 2d 755, 757 (1971).

¶ 57      In *Fordyce's Estate*, the trial court heard the petitioners' complaint that, *inter alia*, the decedent lacked the testamentary capacity to execute a will. *Id*. The testator, a 76-year-old woman, was admitted to the hospital on October 21, met with an attorney on October 22, executed a will on October 23, and passed away on October 30, all in the same year. *Id*. at 757-58. The respondents presented several witnesses, including the testator's doctor, attorney, the attorney's legal secretary, and a funeral director, who testified that, in their opinion, at the time the testator executed her will, she was competent to do so. *Id*. at 758. The doctor testified, however, that, from October 24 to October 30, the testator's health deteriorated quickly. *Id*. The petitioners presented several witnesses, including friends, relatives, and employees of the hospital, who testified to their observations "prior, during and subsequent" to the time the will was executed. *Id*.

20

They testified that the testator "did not respond to them or appear to be aware of what was transpiring about her." *Id*. The trial court found that the petitioners did not satisfy their burden of proving that the testator lacked testamentary capacity. *Id*. at 756. The appellate court affirmed, characterizing the petitioners' evidence as "very indefinite." 758.

¶ 58 Like the timing in *Fordyce's Estate*, the 2012 Rochford Estate Plan was drafted and signed when Ethel was receiving in-patient care and soon to experience a rapid decline. However, this is not enough to establish, as a matter of law, that Ethel lacked testamentary capacity. See *id*. at 758.

¶ 59 Like the attorney in *Fordyce's Estate*, Rochford met with Ethel in the medical facility. Rochford believed that Ethel had testamentary capacity when she informed him and his wife and paralegal, Deb, of her new plan. Deb and co-counsel Volk signed as witnesses that they believed Ethel had testamentary capacity at the time she executed the 2012 Rochford Estate Plan. Rochford testified in deposition that it was his firm's practice to ask elderly clients questions aimed at evaluating capacity prior to execution and he had no reason to believe that Volk had not done so.

¶ 60 Also, in conjunction with Ethel's own signing of the 2012 Rochford Estate Plan and the Notary Public's certificate of acknowledgement of the same, Deb and Volk signed the following statement:

> "I declare under penalty of perjury under the laws of this state that the person who signed or acknowledged this document is personally known to me (or proved to me on the basis of convincing evidence) to be the person who signed or acknowledged this Document in my presence, and that the person appear[s] to be of sound mind and under no duress, fraud or undue influence."

Both Deb and Volk had known Ethel for years, had worked with her in drafting the 2005 and 2009 Rochford Estate Plans, and had visited her in the nursing home prior to drafting the 2012 Rochford Estate Plan.

¶ 61    In contrast, like the petitioners in *Fordyce's Estate*, Michael and Sandy's affidavits do not provide definite markers of incapacity. See *id.* at 756-57 (it is the challenger's burden to prove incapacity). The affidavits contained conclusory statements that Ethel's mental acuity entered a state of decline when she began taking Ativan, an anti-anxiety medication, on August 3, 2012. See *supra* ¶¶ 23-24. The statements contained in Michael's and Sandy's affidavits do little more than generally provide that, sometime between August 3, 2012, when Ethel started taking Ativan, and September 3, 2012, when she passed away, her mental and physical state declined. Michael and Sandy make no assertions as to whether, on August 13, 2012, specifically, Ethel lacked testamentary capacity. Sandy's affidavit refers to a nurse note providing that Ethel was experiencing increased confusion in August 2012, but this note was not entered until August 27, 2012. In fact, prior to August 27, 2012, the last nurse note pertaining to Ethel's confusion had been entered on June 11, 2012. There were no nurse notes pertaining to Ethel's confusion between June 11, 2012, and August 27, 2012, encompassing the dates of both the 2012 Harrod Estate Plan and the 2012 Rochford Estate Plan. Accordingly, we reject Michael's argument that his affidavits were uncontradicted, competent, and dispositive evidence on the issue of Ethel's testamentary capacity.

¶ 62    The trial court found that Michael and Sandy's affidavits "call into question" Ethel's competency on August 13, 2012. However, this is not the standard on summary judgment. To the contrary, if a material fact is in question, summary judgment should *not* be granted. See *Aetna*, 229 Ill. App. 3d at 416. Similarly, that Ralph advocated for the 2009 Rochford Estate Plan over

22

either of the 2012 plans is irrelevant to the question of whether Michael proved as a matter of law that Ethel in fact lacked testamentary capacity on August 13, 2012. For the reasons stated, he has not done so. Michael is not entitled to a summary judgment that the 2012 Rochford Estate Plan is invalid on the grounds that Ethel lacked testamentary capacity.

¶ 63     In sum, the trial court's grant of summary judgment to Michael was a result of at least two errors. First, the trial court addressed Ethel's competence (or testamentary capacity) but did not address the separate question of Michael's undue influence. Second, the trial court misappropriated the burden of proof applicable in summary judgment proceedings, granting summary judgment to one party, Michael, merely because the other party, Ralph, did not prove the validity of the 2012 Rochford Plan as a matter of law. It also *appears* that, after rejecting Ralph's section 4-4 argument in support of the 2009 Rochford Estate Plan, the trial court believed that only the two 2012 plans remained viable. This is not so. Material questions of fact regarding Michael's undue influence in the execution of the 2012 Harrod Estate Plan and Ethel's testamentary capacity in the execution of the 2012 Rochford Estate Plan preclude a grant of summary judgment to Michael. Though we express no opinion in this regard, we note, for example, that if the trial court ultimately finds that Michael exerted undue influence in the execution of the 2012 Harrod Estate Plan and that Ethel lacked testamentary capacity in the execution of the 2012 Rochford Estate Plan, then the 2009 Rochford Estate Plan controls. These questions leave the 2012 Harrod Estate Plan, the 2012 Rochford Estate Plan, *and* the 2009 Rochford Estate Plan available for further consideration.

¶ 64                                III. CONCLUSION

¶ 65     The judgment of the trial court of Peoria County is affirmed in part and reversed in part and remanded.

23

¶ 66     Affirmed in part; reversed in part and remanded.